HELLER INTERNATIONAL CORPORA-
TION, a Delaware Corporation, Plain-
tiff–Appellant–Cross–Appellee,

v.

Alec SHARP, a United Kingdom Subject,
as Lead Underwriter of and for the
Subscribing Syndicates of Underwriters
at Lloyd's, London, Guardian Royal
Exchange Assurance Company, Limit-
ed, a United Kingdom Corporation, As-
sicurazioni Generali, an Italian Corpo-
ration, Bellefonte Insurance Company,
a United Kingdom Corporation, Sphere
Insurance Company, Limited, a United
Kingdom Corporation, and Drake In-
surance Company, Limited, a United
Kingdom Corporation, Defendants–Ap-
pellees–Cross–Appellants.

Nos. 91–3218, 91–3306.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1992.

Decided Sept. 4, 1992.

Rehearing Denied Dec. 3, 1992.

Dan K. Webb, Kimball R. Anderson (argued), Lawrence R. Desideri, Winston & Strawn, David E. Springer, Charles F. Smith, Katherine C. Grady, Linda A. Stark, Wayne W. Whalen, John K. Lyons, Skadden, Arps, Slate, Meagher & Flom, Charles L. Glick, Hedlund & Hanley, Chicago, Ill., for plaintiff-appellant.

Michael A. Pope (argued), Stanley V. Figura, Mark A. Brand, Neal R. Novak, Pope & John, Edward P. McNeela, McNeela & Griffin, Chicago, Ill., for defendants-appellees.

Wendi Sloane Weitman, Robert E. Shapiro, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, Ill., April A. Breslaw, Resolution Trust Corp., Washington, D.C., for amicus curiae Resolution Trust Corp.

Thomas W. Merrill, Jonathan K. Baum, Michael S. Sigal, Sidley & Austin, Chicago, Ill., for amicus curiae Chicago Clearing House Ass'n.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

Heller International appeals the district court's denial of its motion for a judgment

notwithstanding the verdict or, alternatively, for a new trial. Heller contends that the district court's refusal to give a proffered jury instruction requires reversal of the judgment and remand for a new trial. Given the facts presented here, we agree. Heller also appeals the district court's award of costs to defendants as prevailing parties under Federal Rule of Civil Procedure 54(d). That claim is rendered premature by our reversal of the judgment, and the cost award will have to be redetermined after the case is retried. The defendants-cross-appellants (Heller's insurers) also appeal the district court's denial of their motion for judgment n.o.v., and its refusal to give proposed instructions. We affirm these rulings.

## I.

*A. Background Facts*

Heller, a commercial finance company, sued Alec Sharp, the lead underwriter of Lloyd's of London, and several other insurance companies to recover on a fidelity bond issued by these insurers. The bond insured Heller against losses sustained as a result of dishonest and fraudulent acts by Heller employees. This case arises from the activities of a Heller International regional vice president, Irving Chudy. Chudy managed the Phoenix branch office of Heller's subsidiary, Walter E. Heller Western, Inc. From December 7, 1971, until October 29, 1981, Chudy managed the Phoenix office and reported to Sidney Legg, the President of Heller Western, who worked in Los Angeles. Chudy opened the Phoenix office, and hired the key employees. Chudy's immediate subordinate, Rick Normand, stated that Chudy made personal loans to many of the employees in the Phoenix office in order to gain their favor, and so that the employees would feel "indebted" to him. Trial Transcript, Volume 10A, at 1494–95 (hereinafter "Tr. Vol. ___, at ___").[1] Chudy admitted

that he made personal loans to his employees. Tr. Vol. 12, at 2025–26. Legg, Chudy's supervisor, testified that Chudy made a $60,000 loan to the employee who verified the authorization and signed the checks for Heller's Phoenix office. Tr. Vol. 7, at 1001–02. Legg also testified that Heller company policy prohibited personal loans to employees. Tr. Vol. 6, at 774–75.

Other loans Chudy authorized are at the heart of this suit. In 1975 or 1976 he began making personal loans to Rob Brunswick, a Phoenix businessman. Chudy loaned Brunswick over $400,000. In early 1977, Brunswick began borrowing money from Heller under Chudy's authorization. Brunswick used some of that money to repay Chudy. Tr. Vol. 12, at 2049–50. Chudy used the Brunswick loans to funnel money through Brunswick into his own accounts or to companies Chudy owned. Chudy ultimately received more than $1,875,000 through the sham Brunswick transactions. Chudy kept the records of the Brunswick transactions in his office, and marked them "personal and confidential." The defendants never seriously disputed the bond's coverage of these losses.

Another series of loans to El Paso businessman Bruce Evans caused losses to Heller that dwarfed those incurred in the Brunswick transactions. In July 1978, Chudy authorized Heller's financing of Evans' purchase of the Zenith Shirt Company. The previous owner, Herman Gross, agreed to guarantee some of Zenith's existing debt to suppliers. Gross was to receive a percentage of profits and payment for ongoing consulting work. Chudy authorized loans for operating expenses, up to eighty percent of Zenith's accounts receivable. Zenith agreed to document its merchandise shipments.

Problems with the Zenith loan began early in 1979. Chudy learned that Zenith violated the loan agreement by over-spending on capital improvements. Chudy waived the default but failed to disclose the waiver

---

1. The volume numbers for the trial transcript refer to the numbers affixed by the court reporter. For transcripts of proceedings other than the trial, the volume number refers to the numbering system used by the Clerk of the Court when preparing the record on appeal. Unfortunately, these numbers do not coincide, so, for example, trial volume (court reporter) 34 is Clerk of the Court number 52.

in his loan reports. In May 1979, Chudy authorized Heller's guarantee of Zenith debt to one of Zenith's suppliers. Heller's guarantees to suppliers increased to more than $3.3 million over the next two-and-a-half years. Chudy never disclosed these guarantees in the documents he sent to his supervisor, despite Heller regulations that required it.

In addition to the guarantees, Chudy asked Heller's Executive Committee to authorize a $3.4 million line of credit for Zenith. When he made his request, Chudy failed to disclose Zenith's loan violations or the guarantees. Zenith was Phoenix's largest borrower. Evans told Chudy to liquidate the Zenith loans, but Chudy believed the they should try to "string it along." Tr. Vol. 10, at 1558. Chudy told Evans that Zenith should not obtain audited financial statements and that he should be notified if Heller account examiners appeared at Zenith. In his 1979 year-end report on Zenith to Legg, Chudy did not mention the problems with the Zenith account. In 1980, Lee Ash, Heller's account executive assigned to Zenith, conducted a special examination of Zenith's business. Ash discovered that Zenith fraudulently "prebilled" Heller for goods that had been ordered, but not shipped. Because part of Heller's collateral was accounts receivable, the prebilling caused Heller to advance money to Zenith based on collateral that did not exist. Tr. Vol. 8, at 1069–70, 1081; Vol. 10, at 1531–32. Ash informed Chudy that Zenith prebilled about $1 million. Chudy vetoed Ash's suggestion that Chudy inform Legg of the problem. Ash testified that Chudy told him that Legg could not be informed "because it would ruin his [Chudy's] reputation in the business." Tr. Vol. 8, at 1072. Chudy's (and Ash's) failure to inform Legg of the prebilling in his June 1980 account review violated Heller procedures. Tr. Vol. 10A, at 1581.

Gross, Zenith's former owner, complained in September 1980 that Zenith had not made its required payments to him, and that a Zenith supplier was making a claim on Gross's guarantee. Chudy also discovered that Zenith (in violation of the loan agreement) sent $3.11 million of its loan proceeds to its Costa Rican subsidiary. Tr. Vol. 5, at 478–79, Vol. 13, at 2210–11. It was not until Evans, Zenith's then-current owner, left the company in 1981, that Chudy became convinced that Evans stole some of the Heller loan proceeds. *Id.* Finally, on September 15, 1980, Chudy informed Legg that there had been "a small amount of pre-billing, but that it had been taken care of[.]" Tr. Vol. 13, at 2210.

There were more problems with the Zenith loan. By December 1989, prebillings totalled approximately $5 million, Tr. Vol. 13, at 2224, and the loan balance was approximately $9.5 million. Legg told Chudy to reduce the loan balance. At the same time, Ash told Chudy that if the Zenith loan continued at its current rate, it would soon reach $15 million. Tr. Vol. 8, at 1106–07. Chudy suggested that he could use some approved credit, authorized by the executive committee, to loan more to Zenith without having to have it approved. *Id.* at 1108. Ash believed that Chudy wanted to avoid having the executive committee discover how much had been loaned to Zenith. *Id.*

At around the same time, Chudy began to feel uncomfortable with Evans, although he did not believe at that time that Evans was defrauding the bank. So he arranged for Peter Hirsh, an old friend, and Warren Hirsh, his brother, to take over management of Zenith. Tr. Vol. 10B, at 1604. On December 19, 1980, Warren and Peter Hirsh purchased a fifty percent interest in Zenith for $1,000, Tr. Vol. 14, at 2245–46, and the company was renamed Hirsh–Evans. Warren Hirsh was promised a $250,000 salary the first year, which he could increase to $400,000. Vol. 10B, at 1679. Thus, for a $1000 investment, Warren Hirsh received a guaranteed salary of $250,000. Chudy agreed that if the Hirshes came into the company Heller would loan Zenith at least an additional $10 million, and perhaps as much as $18 to $20 million. Tr. Vol. 14, at 2248–49. The "only way" the Hirshes would have gotten involved in the company was with "Heller's obligation to back the company." Tr. Vol. 10B, at 1616 (Testimony of Peter Hirsh).

On the same day the stock purchase agreement was executed, Heller amended its loan agreement to Zenith. The amendment committed Heller to loan an additional $6 million. Tr. Vol. 14, at 2263. As part of the arrangement to bring the Hirshes into the company, Chudy executed a release on behalf of Heller releasing Evans and Zenith of liability for $5 million in prebilling fraud. Vol. 14, at 2255–56. The loan amendment also conditioned the extension of the loan on an agreement increasing Evans' salary to $150,000 per year. *Id.* at 2257–58.

Chudy told Legg that the Hirshes invested $4 million in Hirsh–Evans. He also failed to inform Legg of his commitment (on Heller's behalf) to loan Hirsh–Evans an additional $10 to $18 million. Chudy also failed to disclose that at that point Zenith was $4.5 million in debt. Vol. 14, at 2262. It is not clear from the record whether Chudy told Legg about the Release.

In 1981, when things at Hirsh–Evans failed to turn around immediately, Chudy opened three dummy accounts: Condominium Services Corporation, Pioneer Corporation, and American Cable. Chudy used the line of credit approved by the executive committee to make advances to the false accounts. He used the advances to pay down Hirsh–Evans' loan balance. Vol. 14, at 2292. The false pay-downs allowed Chudy to advance more money to Hirsh–Evans. *Id.* at 2293, Vol. 10A, at 1584. From January until October 1981, Chudy funneled approximately $13 million to Hirsh–Evans through the false accounts. Hirsh–Evans recorded all the advances on loans on its books. Normand, Chudy's "second in command," testified that he believed Chudy was trying to save his job, and avoid having auditors review the accounts at the Phoenix office, which might reveal his embezzlement through the Brunswick accounts. Tr. Vol. 10A, at 1500. During the pendency of these Hirsh–Evans transactions, Chudy continued to channel money through the Brunswick transactions.

In August 1981, at a budget meeting in Los Angeles, Heller's controller asked Chudy about delinquencies in the Hirsh–Evans, Brunswick, and other Phoenix accounts. Chudy said the delinquencies were the result of computer errors, and that he would correct the problems and provide the correct data. Tr. Vol. 21, at 3601. The controller called Chudy a few days later for the correct data, and Chudy told him the delinquencies should be deleted. *Id.* at 3603.

Things began to unravel in September, 1981. Legg pressured Chudy for a field examination of Hirsh–Evans. Tr. Vol. 6, at 650–53. Chudy said that an examination was being conducted, but Legg discovered that this was a lie. *Id.* at 653. Legg sent an examiner from Los Angeles the next day to investigate the Hirsh–Evans account. On October 30, the examiner informed Legg that the Hirsh–Evans' loan balance was $20 million, though Heller's books only showed a $10 million balance. When Legg arrived on Monday, November 2, 1981, he and Normand found that Chudy had emptied his office on October 29, and gone to Milwaukee. *Id.* at 662. Personnel in the Phoenix office informed Legg of the false accounts.

Chudy was indicted and pleaded guilty to felony commission of fraudulent schemes against Heller in connection with the Brunswick accounts. He was sentenced to six years in prison. Heller filed a civil suit against Chudy in Arizona, and recovered $1,197,910 for the losses caused by the Brunswick transactions. In total, Heller lost $15,635,393 through Chudy's conduct. All but $1.875 million were caused by Hirsh–Evans' failure to repay its loans.

Heller notified the defendants of the loss on November 10, 1981. The insurers granted Heller a one-year extension of time under the bond to file its proof of loss to allow Heller to investigate Chudy's conduct. During its investigation, Heller worked with Alfred J. Morgan, Jr., the defendants' adjuster. In December 1982, Heller delivered its proof of loss for $15 million, together with thousands of pages of supporting documents. In January 1982, Morgan traveled to Phoenix, and Heller provided him with details of Chudy's activities, and Morgan informed Heller's

representatives that he was going to recommend that the insurers reserve the full $10 million policy amount to pay Heller's claim. In February 1982, with Morgan's approval, Heller loaned more money to Hirsh–Evans. `Tr. Vol. 20, at 3313.

Over the next two years the defendants investigated Chudy's activities. But, in February 1984, Morgan questioned the bond coverage, and recommended that Heller amend its civil suit against Chudy to include claims on the Hirsh–Evans transactions. Morgan said including the Hirsh–Evans claims in the civil suit would make it easier for Morgan to recommend to the insurers to pay the claim under the bond. Heller's motion to amend its complaint was denied as untimely. In April, Chudy's lawyer contacted Morgan, inviting the defendants to intervene in Chudy's defense in the civil action. Chudy agreed to cooperate with the insurers in the defense of Heller's bond claim in exchange for help in defending the civil action. Vol. 18, at 3011. One of the face-to-face meetings between Morgan, Chudy, and Chudy's lawyer occurred on the day before Chudy's deposition in the civil case, and lasted for four hours. At deposition, Chudy said Legg knew of his activities with Hirsh–Evans.

The negotiations continued between Heller and the insurance companies. At a meeting to settle Heller's claim in March 1985, Morgan announced that the Hirsh–Evans losses were not covered because Chudy did not have the "manifest intent" required by the bond. Morgan also informed Heller that a contractual time bar contained in the bond prevented it from filing suit. According to Heller, this was the first time in four years of investigation and negotiation that Morgan mentioned the limitation period. *See* Appellant's Brief at 19. Heller filed suit two weeks later.

### B. Suit and Trial

Heller, a Delaware corporation with its principal place of business in Chicago, Illinois, sued the defendants (citizens of the United Kingdom) in the Northern District of Illinois. Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

Count one of Heller's complaint sought recovery under a breach of contract claim for the full coverage provided by the bond, $10 million. Count two sought $15.7 million for breach of the implied covenant of good faith and fair dealing. In count three, Heller claimed that the insurance companies' refusal to pay violated the Illinois Insurance Code, § 155(1), and sought attorneys fees and costs. The remaining counts sought prejudgment interest and asserted unjust enrichment claims against some defendants.

The defendants asserted four defenses: the bond did not cover the Hirsh–Evans losses because Chudy lacked the requisite intent; the filing of the proof of loss was delinquent; Heller's proof of loss was false; and that Heller failed to file suit within two years of discovering the losses, and was thus barred from suit by the Condition 15 of the bond. Heller maintained that the bond covered Chudy's conduct and that the defendants had waived or were estopped from asserting the time-for-suit clause.

At trial, Heller tendered instructions on the meaning of "intent" in the bond. The district court refused to give the instructions. During deliberations, the jury sent the judge a note asking for a dictionary. The parties and the judge agreed to provide the jury with a dictionary. The jury returned a verdict in favor of Heller on count one for $77,090, which represented an award for the Brunswick losses only, less the bond's deductible and the amounts recovered from Chudy. The jury ruled for the defendants on the remaining counts.

Heller filed a motion for judgment n.o.v. on the grounds that the district court erred when it failed to give the proposed intent instructions. The court issued a written opinion denying the motion on July 24, 1991. In that opinion he stated that the jury had sent him a written request for a definition of intent, that he had consulted with the parties, and that the parties decided to give the jury a dictionary to discern the meaning of intent. This meant, according to the court, that Heller waived the instructional errors. Heller immediately

filed a motion for relief from the judgment or a new trial because it had never been informed of the jury's request for a definition of intent; it had only been told that the jury requested a dictionary. The court reconsidered, and in a second order issued September 5, 1991, it informed the parties that the jury had written a note, but had only asked for a dictionary, and that the note was lost. The judge denied Heller's motion for relief.

The defendants also filed a motion for judgment n.o.v. They argued that the jury's award to Heller under count one was based upon instructions given by the district court "which effectively directed a verdict in Heller's favor on waiver and estoppel." Cross–Appellants' Brief at 42. The defendants argued that the district court erred in refusing their proposed instruction on the definition of waiver. The court gave Heller's proposed instructions, which included, according to defendants, an erroneous standard of proof. The given instruction stated that the plaintiff had to prove waiver by a preponderance of the evidence; the defendants maintain that waiver must be shown by clear, precise, and unequivocal evidence.

Defendants also objected to the court's instruction on estoppel. On appeal, the defendants renew these objections and also assert that there was insufficient evidence to find estoppel or waiver.

## II.

■ In diversity cases, federal courts apply the substantive law of the state where the suit is brought, including the state's choice of law rules. See Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co., 924 F.2d 633 (7th Cir.1991); Patton v. Mid–Continent Systems, Inc., 841 F.2d 742 (7th Cir.1988). The parties agreed at trial that Illinois law controls this action. Appellant's Brief at 26 n. 11.

■ The central issue presented here is whether the district court instructed the jury properly. In order for a party to contest a district court's failure to give a proposed instruction, the instruction must state the law accurately. Northbrook Excess, 924 F.2d at 638. Moreover,

[a]n error in giving (or refusing to give) a particular instruction will not be considered reversible error unless, considering all the instructions, the evidence and the arguments that the jury heard, it appears that the jury was misled or did not have a sufficient understanding of the issues and its duty to determine them.

Simmons, Inc. v. Pinkerton's, Inc., 762 F.2d 591, 597 (7th Cir.1985) (citations omitted). The instructions must be "evaluated as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well. Reversal is inappropriate unless the jury's understanding of the issues was seriously affected to the prejudice of the complaining party." Wilk v. American Medical Association, 719 F.2d 207, 218–19 (7th Cir.1983), cert. denied, 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). Nevertheless, "[w]hen jury instructions, taken as a whole, give the jury a misleading impression or inadequate understanding of the law, a new trial is warranted." Carvel Corp. v. Diversified Management Group, 930 F.2d 228, 232 (2d Cir.1991).

■ We believe the district court's refusal to instruct the jury on the meaning of "manifest intent" left it with an inadequate understanding of the law, and warrants a new trial. We also reject the defendants' contention that Heller has waived the error because of the form of its proposed instructions, or because it agreed to give the jury a dictionary. "The fact that counsel did not tender perfect instructions does not immunize from scrutiny on appeal a failure to instruct the jury adequately concerning the issues in the case." Alloy Int'l Co. v. Hoover–NSK Bearing Co., 635 F.2d 1222, 1226 n. 7. (7th Cir.1980).

The language of the fidelity bond controls the parties' contractual obligations in this case. The bond provided coverage up to $10 million for:

(A) Loss of Money, Securities[,] and any other property which the insured shall

sustain resulting directly from one or more fraudulent or dishonest acts committed by an Employee, acting alone or in collusion with others. Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by an Employee with the *manifest intent:*

(a) to cause the insured to sustain such loss; and

(b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

Fidelity Bond, Plaintiff's Exhibit 5 (emphasis added). The bond does not define "manifest intent." This language was introduced in 1976, and is part of a standard form used throughout the fidelity insurance industry. *FDIC v. St. Paul Fire and Marine Ins. Co.,* 942 F.2d 1032, 1035 (6th Cir.1991); *see also Mortell v. Ins. Co. of North America,* 120 Ill.App.3d 1016, 76 Ill.Dec. 268, 458 N.E.2d 922 (Ill.App. 1st Dist.1983). The central issue in the case is whether Chudy acted with the "manifest intent" required by the bond. Tr. Vol. 7, at 940–41.

Heller proposed several instructions on the meaning of manifest intent that were rejected by the district court as "too simplistic for the jury." Tr. Vol. 33, at 6125.[2] The district court's failure to give the requested instructions was error. *See Glusband v. Fittin Cunningham & Lauzon, Inc.,* 892 F.2d 208, 210–11 (2d Cir.1989). While to the experienced district judge these concepts may appear obvious, "[t]he

term intent has a technical meaning in the law," and should have been defined for the jury. *Hanson PLC v. National Union Fire Ins. Co.,* 58 Wash.App. 561, 794 P.2d 66, 72 (1990).

The need to define the term was accentuated in this case because of the way the parties presented the facts to the jury. For example, in closing argument, Lloyd's attorney stated,

> And the critical question here for you to consider is: What was Irving Chudy's manifest intent? You are going to be the ones who will have to apply this language to the evidence of the case. But I would like to give you a couple of things to consider while you think about how this language works and what it means in this particular matter.

Tr. Vol. 34 at 6168. He continued,

> What did Irv Chudy believe in late 1980? And belief is important. Because, again, we have got to be looking at manifest intent. And that's what you have to decide later on.... Why didn't Irv Chudy pull the plug [on Hirsh–Evans]? ... Chudy believed he could work it out, or he was told not to pull the plug, "manifest intent to cause the loss," I suggest to you that if he truly thought he could work it out, that isn't what his manifest intent was, to cause a loss.

*Id.* at 6178–80. The impact these arguments, unguided by instructions from the court on the meaning of "manifest intent," was compounded by a long series of questions posed to Chudy by the defense. The district court initially stated when he ruled on a motion *in limine* before trial that Chudy was a defense witness. Transcript of Proceedings of October 4, 1990, Vol. 10 of 58, at 174. Nevertheless, defense coun-

---

**2.** Among those rejected are the following:

Plaintiff's Proposed Instruction No. 32:
A "manifest" intent is an intent that is readily perceived by the senses.

Plaintiff's Proposed Instruction No. 33:
Intent ordinarily may not be proved directly.... But you may infer a person's intent from circumstances.... You may consider reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted....

Other instructions defined "knowingly," distinguished "motive" from "intent," and explained that it was not necessary for Heller to show that Chudy's sole intent was to obtain a financial benefit for himself or someone else, only that "Chudy's intent included an intent to obtain a financial benefit for himself or for some other person or organization...." Plaintiff's Proposed Instruction No. 38.

These instructions are substantially correct, but we shall discuss the appropriate content more fully below.

sel was allowed (over objection) to lead Chudy through a series of questions about his intent when he opened the false accounts. Tr. Vol. 18, at 2877–78. A few of them illustrate why the jury needed to be instructed on the meaning of intent:

Q. Did you create the Condo account with the intent to cause Heller to sustain a loss?

A. No.

Q. Did you create the Pioneer account with the intent to cause Heller to sustain a loss?

A. No.

Q. How about the American Cable account?

A. No.

Q. Did you use any or all of those accounts with the intent to cause Heller to sustain a loss?

A. No.

*Id.* at 2877. This series of questions, coupled with the closing arguments, and the lack of an instruction, could well have left the jury with a mistaken impression about the meaning of intent.

What impression should the jury have had about the meaning of manifest intent in the bond? The case law on the subject is not entirely consistent. "As this is an Illinois diversity action, ... [t]his court's obligation is to follow the Illinois Supreme Court on this question, or if that court has not yet spoken, as it has not, predict what that court would do if presented with the issue." *Hartford Accident & Indemnity Insurance v. Wash. Nat. Ins.*, 638 F.Supp. 78, 81 (N.D.Ill.1986) (citing *White v. United States*, 680 F.2d 1156, 1161 (7th Cir.1982); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980)).

■ There are no Illinois cases directly on point. The district court relied in part upon *Mortell v. Insurance Co. of North America*, 120 Ill.App.3d 1016, 76 Ill.Dec. 268, 458 N.E.2d 922 (1983). *Mortell* involved an action by a futures commodity company to recover on broker's blanket bonds which contained the same provisions covering losses caused by fraudulent and dishonest acts committed by employees with the manifest intent to cause the insured a loss and to obtain a financial benefit for the employee. The question presented was whether the bond covered fraudulent and deceptive selling practices. The bond required a "financial benefit for the employee." Under governing law, benefits earned in the normal course of employment such as commissions do not qualify as "financial benefit[s]" as the term is used in the bond. *Id.* at 929. The salesmen did not gain anything but the commissions from the unauthorized sales, and that meant they received no financial benefit. It is in this regard that the court stated that "[t]he terms of the amendment [to the bond] are unambiguous and must be given effect as written." *Id.* (citing *Sowinski v. Ramey*, 36 Ill.App.3d 690, 695, 344 N.E.2d 635 (1976)). The meaning of manifest intent was not in issue. Thus, the district court's reliance on this case to hold that the term "manifest intent" was unambiguous (and hence no instruction was required), was misplaced. *Heller International Corp. v. Sharp, et al.*, 1991 WL 195786, at *3 n. 3, 1991 U.S. Dist. Lexis 13473, at *8 n. 3 (Sept. 20, 1991).

Another Illinois case, however, does address the meaning of intent in insurance contracts. *Aetna Casualty & Surety Co. v. Freyer*, 89 Ill.App.3d 617, 44 Ill.Dec. 791, 411 N.E.2d 1157 (1980). *Freyer* interpreted a policy excluding coverage for intentional injuries. "The word 'intent' ... in insurance policies denotes that the actor desires to cause the consequences of his act or believes that the consequences are substantially certain to result from it." *Id.*, 44 Ill.Dec. at 793, 411 N.Ed.2d at 1159. This construction comports with authority from other jurisdictions interpreting fidelity bonds. We believe it reflects the correct interpretation of the term "intent."

Other courts have developed similar interpretations of "manifest intent" which we believe should govern the jury instructions in this case on remand. The Sixth Circuit, in rejecting an argument that an actor's intent could not be inferred from her actions, has stated:

Nonetheless, even in the criminal context, a trier of fact *can* make inferences regarding intent based on the natural and probable consequences of actions. It could hardly be otherwise. Intent, as used in ordinary language, is thought to refer to a subjective phenomenon that takes place inside people's heads. In fact, however, the word "intent" is really shorthand for a complicated series of inferences all of which are rooted in tangible manifestations of behavior. For us, the external behavior ordinarily thought to manifest internal states is all that matters. We need not concern ourselves with the question of whether mental states *actually* exist, as an ontological matter. *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash.App. 561, 794 P.2d 66, 72 (1990) ("A secret intent is of no consequence."). Although the district court employed the language of "subjective intent" as if it believed that the case turned entirely on inner thoughts, it relied in its analysis, on external indicia of subjective intent—as it had to.

The FDIC focuses its argument on the term "intent," and it attempts to ignore the word appearing just before "intent"—"manifest." The clause at issue here was introduced in 1976, and has been adopted throughout the fidelity insurance industry. *Hartford Accident and Indemnity Ins. Co. v. Washington National Insurance Co.*, 638 F.Supp. 78, 81 (N.D.Ill.1986). " 'Manifest intent,' in such a provision, means apparent or obvious." *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wash App. 561, 794 P.2d 66, 72 (1990). Although the concept of "manifest intent" does not necessarily require that the employee actively wish for or desire a particular result, it does require more than a mere probability. *See id.* (manifest intent exists when a particular result is "substantially certain" to follow from conduct).

*FDIC v. St. Paul Fire and Marine Ins. Co.*, 942 F.2d 1032, 1035 (6th Cir.1991). We concur with this explanation of the term, and believe it is consistent with Illinois law.

As the Fifth Circuit recently explained, to determine whether an employee intended to cause a loss, "we do not inquire solely into the subjective motive or purpose of the employee." *First National Bank of Louisville v. Lustig*, 961 F.2d 1162, 1166 (5th Cir.1992), *reh'g . denied, clarified,* (June 29, 1992). *See also United States Fidelity & Guaranty (USF & G) v. Citizens Bank of Tazewell*, 718 F.Supp. 471, 474 (W.D.Va.1989) ("It is necessary to scrutinize Rife's [the employee's] acts and the circumstances surrounding those acts in order to determine Rife's intent. It is rare that a person will admit to an intention to commit a dishonest or fraudulent act. Even in a criminal context, however, it can be inferred that a person intended the natural and probable consequences of his acts."). *Liberty National Bank v. Aetna Life & Casualty Co.*, 568 F.Supp. 860, 868 (D.N.J.1983) ("Intent to injure or defraud may be inferred from the fact of injury, if injury is the natural result of a voluntary act on the part of the employee."). *Cf. National Bank of Pakistan v. Basham*, 142 A.D.2d 532, 531 N.Y.S.2d 250, 251 (1988), *aff'd*, 73 N.Y.2d 1000, 541 N.Y.S.2d 345, 539 N.E.2d 101 (1989).

[T]he claim by an errant employee that no loss to the bank was intended will seldom be conclusive. When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss.

*Lustig*, 961 F.2d at 1166. On remand, the jury should be instructed on "manifest intent" pursuant to these authorities, together with *Freyer*'s definition of intent. *Freyer*, 44 Ill.Dec. at 793, 441 N.E.2d at 1159. As the court in *Lustig* explained,

The jury should be instructed that in answering the question of intended loss it should consider the range of evidentiary circumstances, including the relationship between the borrowers and the employee, the employee's knowledge of the likelihood that the loans would not be repaid, and all the other surrounding cir-

cumstances bearing on the employee's purpose.

*Lustig,* 961 F.2d at 1166–67.

Because the inadequate jury instructions require a new trial, we decline to reach the plaintiff's assertion that the defendants' closing argument also requires reversal. We also need not reach the plaintiff's challenge to the district court's award of costs to defendants as prevailing parties because the case must be retried. This leaves the cross-appeal on count one.

■■■ The defendants assert that they did not waive and were not estopped from asserting the bond's two year limitation on suit, and for that reason Heller's suit was time-barred, and the judgment as to count one should be reversed. The bond provides:

> Condition 15: No suit to recover on account of loss under this Bond shall be brought ... after the expiration of twenty-four months from the date of the discovery as aforesaid of such loss.

The district court refused the defendants' proposed instruction on this issue, and denied their motion for judgment n.o.v. The defendants argue that the jury was improperly instructed. As Heller correctly points out, however, judgment n.o.v. is not the correct remedy for erroneous jury instructions. The proper remedy is a new trial. *Kendrick v. Illinois Central Gulf Railroad Co.,* 669 F.2d 341, 343 (5th Cir.1982). "A judgment n.o.v. would be proper only if the evidence were insufficient to support a judgment for the plaintiff even under the proper instructions." *Id.* (citing *Ellis v. Chevron U.S.A., Inc.,* 650 F.2d 94, 96–97 (5th Cir.1981)). We shall consider the sufficiency of the evidence supporting the judgment below.

The defendants contend that the trial court's instructions "effectively directed a verdict in Heller's favor on waiver and estoppel." Cross–Appellants' Brief at 42. They complain that the instruction on estoppel was erroneous because it failed to include an essential element of estoppel: reasonable detrimental reliance. They also argue that the district court gave a "diluted definition" of waiver, and "improperly

highlighted four of Heller's waiver arguments." Cross–Appellants' Brief at 44. Finally, defendants assert that the instruction on the plaintiff's burden of proof of waiver was contrary to Illinois law under *Ryder v. Bank of Hickory Hills,* 146 Ill.2d 98, 165 Ill.Dec. 650, 585 N.E.2d 46 (1991).

■■■ Defendants' first argument is without merit. They complain that the instruction on estoppel did not contain a necessary element—reasonable detrimental reliance. The instruction, which tracked the language of the governing Illinois cases, did include this element. It provided:

> Estoppel is a principle that bars an insurer from defending on the grounds of a limitation of suit provision in the policy if its conduct or statements, actions or inactions, induced the plaintiff to reasonably believe that its claim would be paid or settled without suit. Unlike waiver, estoppel does not focus on the conduct or the intent of the insurer, but rather on the prejudicial effect of the insurer's conduct on the insured; that is, whether the insured was misled to its detriment....

Plaintiff's Proposed Instruction No. 55. This includes the element defendants complain about, and correctly states the law. *See, e.g., Koclanakis v. Merrimack Mutual Fire Insurance Co.,* 899 F.2d 673, 676 (7th Cir.1990). A trial court need not give a proposed instruction if the essential points are covered by those that are given. Moreover, a district court has substantial discretion with respect to the specific wording of jury instructions. *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990).

■■■ The defendants' challenge to the so-called "diluted" definition of waiver is also without merit. The trial court gave the following instructions on waiver:

> Waiver is the intentional relinquishment of a known right. Waiver may be expressed or implied, arising from the acts or the words or the conduct or the knowledge of the defendants. The plaintiff has the burden of showing any waiver by the defendants by the preponderance of evidence.

Waiver is a unilateral act on the part of the insurer, and no act of the insured is required to result in a waiver. Moreover, the insured is not required to have relied on any act or conduct of the insurer.

Waiver may arise if the insured does something that is inconsistent with an intent to insist on the strict performance of [Condition] 15 [of the bond] or on a course of conduct on the part of the insurer that is inconsistent with or in disregard of the terms of the contract.

Tr. Vol. 34, at 6257. The court then gave the jury a list of factors it could consider in determining whether the defendants waived the two-year limitations period. These included: whether defendants conceded liability for all or part of Heller's claim; the pendency of the defendants' investigation of the claim and negotiations with Heller about the claim; any assurances that the loss would be covered or settled; and whether defendants failed to deny liability before the end of the limitations period. Listing these factors did not "improperly highlight[ ]" the plaintiff's arguments; they are relevant considerations in the waiver determination. *See, e.g., Insurance Corp. of Ireland, Ltd. v. Board of Trustees of S. Illinois Univ.*, 937 F.2d 331, 337 (7th Cir.1991); *National Discount Shoes v. Royal Globe Insurance*, 99 Ill. App.3d 54, 54 Ill.Dec. 263, 266–268, 424 N.E.2d 1166, 1169–1171 (1981) (and cases cited therein); *Ames v. Crown Life Insurance Co. of Toronto*, 85 Ill.App.3d 203, 40 Ill.Dec. 521, 406 N.E.2d 222 (1980) (and cases cited therein); *Downing v. Wolverine Insurance Co.*, 62 Ill.App.2d 305, 210 N.E.2d 603, 608 (1965) (discussing ongoing negotiations). The district court's waiver instruction stated the law accurately.

▮ The court also instructed the jury that the plaintiff had to prove the defendants waived the limitation on suit clause by a preponderance of the evidence. The defendants argue this is contrary to *Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 165 Ill.Dec. 650, 585 N.E.2d 46 (1991). It is not. In *Ryder*, the Illinois Supreme Court did not announce a new standard of proof, it merely explained:

Implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver. An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention.

*Ryder*, 165 Ill.Dec. at 653, 585 N.E.2d at 49 (citations omitted). Thus, the Court explained that the intent to waive should be clear from the person's act (i.e. the act should be decisive and unequivocal), not that proof of the act must meet a heightened standard. "The normal standard of proof in a civil case is, of course, proof by a preponderance of the evidence...." *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir.1992), *reh'g denied, amended* (7th Cir. 1992). Other than *Ryder*, defendants provide no authority for the proposition that there is a heightened proof standard for waiver. Because *Ryder* does not raise the burden of proof, the district court's preponderance instruction was correct.

▮ Finally, cross-appellants argue that there was insufficient evidence to support a finding that they waived or are estopped from raising Condition 15 of the bond, and that we should reverse the jury's verdict, and grant judgment in its favor on count one. Waiver is a question of fact for the jury. *Rosenburg v. Lincoln American Life Insurance Co.*, 883 F.2d 1328, 1334 (7th Cir.1989). We will not set aside a jury verdict if a reasonable basis exists in the record to support it. *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir.1991). "In examining a jury's verdict, we view the evidence in the light most favorable to the prevailing party and the question of credibility and weight of evidence is within [the] purview of the jury." *Id.*

▮ Waiver, as the defendants state, is the intentional relinquishment of a known right. *See Vaughn v. Speaker*, 126 Ill.2d 150, 161, 127 Ill.Dec. 803, 808, 533 N.E.2d 885, 890 (1988), *cert. denied*, 492

U.S. 907, 109 S.Ct. 3218, 106 L.Ed.2d 568 (1989). Moreover, as the *Ryder* court explained, "[a]n implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention." 165 Ill.Dec. at 653, 585 N.E.2d at 49 (quoting *Kane v. American National Bank & Trust Co.*, 21 Ill.App.3d 1046, 1052, 316 N.E.2d 177 (1974)). Here, there was ample evidence to support the jury's conclusion that the defendants waived the limitations period.

Heller first reported its loss to the defendants in a letter dated November 10, 1981. The defendants gave Heller a one-year extension of time under the bond to investigate the claim. Heller's controller, Carl Quinn, met with Lloyd's representative, Alec Sharp, in February 1982. Quinn testified that Sharp said that the bond "is for matters like Phoenix....". Tr. Vol. 21, at 3612; Vol. 22, at 3701–02. Heller's general counsel testified that Quinn reported to him Sharp's comment about the coverage when he returned from the London meeting. Tr. Vol. 20, at 3307–08. Stephen Studer, Heller's assistant general counsel, testified that Alfred Morgan, Lloyd's attorney and adjustor, told him in January 1982 that "he was going to recommend the full policy limit to Lloyd's." Vol. 23, at 3942. Studer informed his superiors of Morgan's position after he returned from the meetings with Morgan. *Id.* at 2947. Heller's general counsel testified that Studer informed him of Morgan's statement. Vol. 20, at 3299.

Heller sent its proof of loss, together with supporting documents to Morgan on December 21, 1982. For two years after the proof of loss was submitted, the defendants investigated and the parties negotiated about the claim. Heller's general counsel testified about "many" conversations he had with Morgan between March and October 1983 concerning Morgan's investigation of Chudy's activities. Tr. Vol. 20, at 3341–43. In October 1983, Heller's general counsel was informed that Morgan wanted to reduce the maximum claim to the policy limit of $10 million. *Id.* at 3347. The general counsel testified that Heller did not sue the defendants during the two years since the Chudy losses were discovered because "we were in a steady and continuing stream of negotiation which ... was progressing, and ... I had every reason to believe that it would conclude with a settlement of the claim." *Id.* at 3349. At that time the general counsel knew of Sharp's comments about the coverage, and that Morgan's recommendation to the defendant-insurers to reserve the full policy limit had been followed. *Id.*

Heller's general counsel also testified that "[t]here had been an acknowledgment on more than one occasion by Mr. Morgan that there were appropriate and legitimate claims, losses that were covered by the policy." *Id.* at 3350. Further, Heller settled other claims with defendants after the bond's suit limitation expired. *Id.* In December 1983, Morgan and the general counsel exchanged letters on the amount of Heller's claim, and the availability of documents in Heller's office for Morgan's investigation. One of Morgan's associates came to Chicago to review Heller documents in January 1984. Then, in February 1984, Morgan and his associate came to Chicago and met with Heller's general counsel, the assistant general counsel (Studer), and Heller's insurance brokers, who acted as go-betweens for Heller with the defendants. At that meeting, Morgan stated that based upon his associate's investigations, Heller's Hirsh–Evans claims were not covered by the bond.

In subsequent negotiations, Morgan stated that if Heller sued Chudy on the Hirsh–Evans losses (as well as the Brunswick losses) Morgan would be in a better position to recommend to the defendants to pay the claim. Vol. 20, at 3366–67. In April 1984, Chudy's counsel contacted Morgan, and offered to cooperate with Morgan and the insurers. Heller did not learn that Morgan was going to visit Chudy until June of 1984, when one of Heller's agents met with the insurers' representative in London. Tr. Vol. 20, at 3373. Morgan met with Chudy and his lawyers on June 20, 1984. At a meeting on July 10, 1984 in

Morgan's New York office, Morgan informed Heller's general counsel that he had advised Chudy about his defense. *Id.* at 3379. After this meeting, settlement negotiations broke down somewhat, and in February 1985, Heller hired outside counsel to draft a settlement proposal for the defendants.

In March 1985, there was another meeting with Morgan and his associate, Heller's general and assistant general counsel, and their outside attorneys. The purpose of this meeting was to settle Heller's claims. At that meeting Morgan announced that Heller was barred from suit by Condition 15. *Id.* at 3385. Heller's general counsel testified that when asked at that meeting, Morgan admitted that he had not raised that contract provision previously. *Id.* at 3386.

This testimony—which the jury was entitled to believe—provided a more than adequate basis for a finding that Heller waived Condition 15. The defendants' statements to Heller's agents prior to the expiration of the time limitation that the bond was intended to cover the Chudy losses, that the full amount of the bond had been reserved, and their continued investigations and negotiations throughout the four-year period from 1981 until 1985, were sufficient to support a finding that the defendants waived Condition 15. Moreover, the defendants also settled other Heller claims after the expiration of the limitations on suit clause. In *Rosenburg v. Lincoln American Life Insurance Co.*, 883 F.2d 1328, 1335 (7th Cir.1989), this court noted that parties are entitled to rely on an insurer's past waivers of contract conditions. We conclude that "all of the evidence, viewed in the light most favorable to the plaintiff[ ], does not 'so overwhelmingly favor [the defendants] that no contrary verdict based on that evidence could ever stand.'" *Id.* at 1335 (quoting *Pedrick v. Peoria and E. R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967)).

Because we find there was sufficient evidence to support the jury's verdict on waiver, and because the district court's instructions on both waiver and estoppel were proper, we decline to review the sufficiency of the evidence supporting estoppel.

## III.

For the foregoing reasons, we deny the defendants' cross-appeal, and affirm the jury's finding that defendants waived Condition 15. We grant the plaintiff's appeal on the faulty jury instructions, and vacate the judgment, and remand for a new trial consistent with this opinion, and pursuant to the provisions of Circuit Rule 36.