ANDREW RYDER *et al.*, Appellees, v. BANK OF
HICKORY HILLS *et al.*, Appellants.

*Opinion filed September 26, 1991.—Modified on
denial of rehearing February 3, 1992.*

CUNNINGHAM, J., took no part.

Callahan, Fitzpatrick, Lakoma & McGlynn, of Oak Lawn (William F. Fitzpatrick and Ronald V. Hirst, of counsel), for appellants.

Ambrose & Cushing, P.C., of Chicago (John C. Ambrose, of counsel), for appellees.

JUSTICE MORAN delivered the opinion of the court:

The plaintiffs, Andrew Ryder, his wife, Rose Marie Ryder, their son, Eugene Ryder, and his wife, Diane Ryder, filed a complaint in the circuit court of Cook County against defendants, Bank of Hickory Hills (the Bank), and James and Frank Hannigan for rescission of a deed conveying title to land. In an amendment to their com-

plaint, plaintiffs alleged, *inter alia,* that the real estate which was pledged as collateral to secure a note dated June 18, 1980, should not have been sold. After a bench trial, the court found that the Bank did not waive its right to accelerate certain loans and that the sale of the collateral which supported those loans was proper, given the terms of the Uniform Commercial Code (the Code) (Ill. Rev. Stat. 1985, ch. 26, par. 9—504). Plaintiffs appealed and the appellate court, by a Rule 23 order (196 Ill. App. 3d 1103 (unpublished order under Supreme Court Rule 23)), reversed, finding the Bank "waived *** the acceleration rights it possessed in October 1983." This court allowed defendants' petition for leave to appeal (134 Ill. 2d R. 315(a)).

The sole issue presented for review is whether the Bank waived its acceleration rights.

The relevant facts are as follows. In June 1980, Eugene and Diane Ryder obtained a loan from the Bank in which the total payments amounted to $36,409.20 (commercial loan). The commercial loan proceeds were to be used in Eugene's business, E.A. Ryder's Carpet Fashions, Inc. The loan was evidenced by a "Note and Security Agreement" (the agreement) which was signed by Eugene, Andrew, and Rose Marie Ryder. To secure the payment of the loan, Eugene and Diane executed a security instrument wherein they assigned their beneficial interest in their condominium residence, which was held in trust by the Bank. As additional security for the loan, Andrew and Rose Marie Ryder also executed a security instrument wherein they assigned their beneficial interest in their home, which was likewise held in trust by the Bank.

The relevant provisions of the agreement provided, in pertinent part, as follows:

"SECURITY INTEREST: This loan is secured by a security interest in the property hereinafter described

and *** [the] Bank's *security interest secures all other existing and future indebtedness and obligations of Debtor to the Bank.*

\* \* \*

ACCELERATION: If Debtor *shall default in the payment of any installment of this note when due or in the payment or performance of any other obligation* or liability to Bank secured hereby; or, in case of loss, substantial damage to, destruction, *sale*, encumbrance, concealment, removal, attachment or *levy upon the collateral;* *** *or Bank shall deem itself insecure*, then upon the occurrence of any of the foregoing events of default, *Bank may declare all installments of this note and all other indebtedness secured hereby immediately due and payable*, without notice or demand, and thereupon the parties shall have all of the rights and remedies provided by Article 9 of the Uniform Commercial Code ***.

\* \* \*

1. *** (b) that Debtor will not *sell*, lease or encumber *the collateral* or grant any subsequent security interest therein *nor part with possession thereof ***."* (Emphasis added.)

In addition to the commercial loan, Eugene obtained two other loans from the Bank: (1) a note dated January 20, 1979 (mortgage loan), for $30,000, which was secured by a mortgage on Eugene and Diane's condominium; and (2) an unsecured promissory note in the amount of $2,500 which was dated November 29, 1982 (unsecured loan) (the total payments, including interest, on this loan equalled $3,208.68). When the security interest and acceleration provisions of the agreement are read together, the Bank was given the right, depending upon the circumstances, to accelerate the installment payments of all three loans.

In 1981, a year after plaintiffs entered into the agreement, Eugene and Diane entered into an "Installment Agreement for Warranty Deed" (real estate contract) wherein they agreed to convey their condominium to

John and Pamela Hanos for the price of $50,000. They did not inform the Bank of this transaction. According to the terms of the real estate contract, Eugene and Diane were to receive $1,000 on June 1, 1981, $9,000 upon closing, and the balance of $40,000 was to be paid in monthly installments of $310 for a term of 36 months, with a final payment due 35 months after the first monthly installment. The Hanoses took possession of the condominium in the fall of 1981 and Eugene received $10,000.

The real estate contract entered into by Eugene and Diane was in direct violation of the agreement. The agreement provided that the "[d]ebtor will not *sell*, lease or encumber the collateral ***." (Emphasis added.) Moreover, the agreement further provided under the acceleration provision, that if the collateral was sold the Bank could "declare all installments of th[e] [commercial loan] and all other indebtedness [the mortgage and unsecured loans] *** due and payable" and pursue its rights and remedies under article 9 of the Code.

Phillip Sirotzke (Sirotzke), the Bank's department head for commercial and installment loans, testified as follows: In September 1983, he received a "Notice of Levy" from the Internal Revenue Service which indicated that Eugene owed $17,773.08 in taxes; in October 1983, he learned for the first time that the Ryder's condominium was sold; also, at about this time, the commercial and unsecured loans were in arrears; he was concerned; and consequently, the Bank exercised the acceleration provision under the agreement and demanded payment in full on the commercial, mortgage, and unsecured loans.

In November 1983, Sirotzke telephoned Eugene and told him that the sale of the condominium accelerated the agreement and, if he wanted to prevent foreclosure, the Hanoses were going to have to obtain a loan. There-

after, Eugene accompanied the Hanoses to the State Equity Company where the Hanoses applied for a loan. The following day, Eugene phoned Sirotzke and informed him that the Hanoses had applied for a loan. Sirotzke informed Eugene he owed $44,000 (the balance of all three loans combined), and that the three loans would have to be paid in full. The Bank deferred further action at this time with the understanding that the proceeds from the sale of the condominium would be applied to all three loans, leaving a small amount due to the Bank.

In March 1984, the Bank learned that the Hanoses were not given a loan by State Equity Company. Towards the end of March 1984, Eugene contacted Sirotzke and asked him, "What can we do about this?" According to Eugene, Sirotzke answered by saying, "You've got to come up with some money."

On April 2, 1984, Eugene went to the teller window at the Bank and paid roughly $4,300 toward the three loans. He made the $4,300 payment by tendering to the Bank three separate checks made payable to the Bank's order. The amount of each check satisfied the arrearages on each particular loan. In exchange for the three checks, Eugene was given receipts which showed that the checks were received as loan payments. According to his records, Eugene believed this payment had the effect of making him current on all of the installment payments due on each of the three loans.

On April 4, 1984, the Bank sent notices of public sale of the collateral (the condominium and single-family home) to Eugene and Andrew Ryder advising them that a sale was scheduled for April 19, 1984. Eugene received the notice and contacted his attorney, who arranged a meeting with Sirotzke. On April 13, 1984, a meeting was held between Sirotzke, Eugene, and his attorney. It was at this meeting that Sirotzke first learned that Eugene had made payments on the three loans. The Bank agreed

to call off the sale scheduled for April 19, 1984, and it continued the matter for an additional 30 days so that Eugene could refinance or sell his interest in the condominium, and it was further agreed that an additional extension would be considered if Eugene would pay the Bank $10,000 (the amount Eugene received from the Hanoses under the real estate contract).

On April 19, 1984, Eugene delivered a $1,000 check to Sirotzke and the money was applied to the mortgage loan. On May 10, 1984, $967.76 was paid to the Bank—$611.82 of which was applied to the commercial loan and $355.94 was applied to the mortgage loan. Nevertheless, the Bank dispatched by certified mail a notice of public sale, dated May 10, 1984, notifying the Ryders of an impending sale of the collateral set for June 1, 1984. The collateral, Eugene's condominium and his parents' home, was sold on June 1, 1984, to James and Frank Hannigan for $39,200. Eugene later repurchased his parents' home from the Hannigans for $43,000. Eugene was able to raise $43,000 by contributing $13,000 and obtaining $10,000 from his mother and $20,000 from his sister. In addition, Eugene located a buyer for the condominium who purchased it from the Hannigans for $42,000.

On appeal defendants contend that the plaintiffs did not establish that the Bank waived its acceleration rights under the agreement. Conversely, plaintiffs maintain that the Bank waived its rights to accelerate the three loans because of their cooperative conduct as evidenced by the following acts of the Bank: the cancellation of the first scheduled sale of the collateral; the assistance and encouragement expended by the Bank relative to the sale of the condominium to the Hanoses; and the Bank's acceptance of the April and May payments from Eugene Ryder.

Waiver is defined as the intentional relinquishment of a known right. (*Vaughn v. Speaker* (1989), 126 Ill. 2d

150, 161; *Sexton v. Smith* (1986), 112 Ill. 2d 187, 193; *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 499; *Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 372; *First Lutheran Church v. Rooks Creek Evangelical Lutheran Church* (1925), 316 Ill. 196, 200; *Ferrero v. National Council of Knights & Ladies of Security* (1923), 309 Ill. 476, 481; *Perin v. Parker* (1888), 126 Ill. 201, 206.) Waiver may be made by an express agreement or it may be implied from the conduct of the party who is alleged to have waived a right. (*Sexton*, 112 Ill. 2d at 194; *Western Casualty*, 105 Ill. 2d at 499.) In the instant case plaintiffs maintain, and the appellate court agreed, that the Bank impliedly waived its acceleration rights under the agreement.

Since the plaintiffs are claiming waiver, they had the burden of proving at trial that the Bank knew of its acceleration rights, and those facts which evidenced an intention by the Bank to waive such rights. (*Ferrero*, 309 Ill. at 481; *Kane v. American National Bank & Trust Co.* (1974), 21 Ill. App. 3d 1046, 1050.) Implied waiver of a legal right must be proved by a clear, unequivocal, and decisive act of the party who is alleged to have committed waiver. (*Kane*, 21 Ill. App. 3d at 1052; *Klim v. Johnson* (1958), 16 Ill. App. 2d 484, 493; see also *Kelly v. Economy Fire & Casualty Co.* (1990), 196 Ill. App. 3d 337, 340.) "An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of conduct as to sufficiently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it." (*Kane*, 21 Ill. App. 3d at 1052.) Whether the Bank waived its acceleration rights is a question of fact and "[i]t is axiomatic that this court will not disturb a trial court's finding unless that finding is contrary to the manifest weight of the evidence." (*Sexton*, 112 Ill. 2d at 194.) After reviewing the record, we find that the trial court was correct

in holding that the Bank did not waive its acceleration rights under the agreement.

During September and October of 1983, the Bank became aware of a number of circumstances which gave it the right to declare the remaining balance of all three loans immediately due and payable: Sirotzke received a tax levy from the Internal Revenue Service which showed that Eugene owed over $17,000 in taxes; Eugene and Diane sold the condominium; and the payments due on the commercial and unsecured loans were in arrears. Consequently, in October 1983, the Bank notified Eugene by letter that it exercised its acceleration rights and demanded payment in full on the outstanding balance of the three loans.

The appellate court found, in contrast to the findings of the trial court, that the Bank waived its rights through its course of conduct following October 1983. The record simply does not support such a finding.

Sirotzke had a telephone conversation with Eugene in November 1983, where he told him that a "balloon [payment] [wa]s coming up" and if he wanted to prevent foreclosure, the Hanoses were going to have to get a loan. Essentially, the Bank deferred its right to sell the collateral because it was understood between Eugene and Sirotzke that in the event the Hanoses received a loan to buy the condominium, the loan proceeds would be used to satisfy the outstanding indebtedness of all three loans. In March 1984, the Bank sent a letter to the company the Hanoses had sought a loan from, and in the letter, the Bank indicated that it was holding Eugene and Diane Ryder responsible for the *total balance* of all three loans—over $43,000.

On March 30, 1984, after the Bank learned that the Hanoses' loan was not approved, Eugene phoned Sirotzke and asked him, "What can be done about this?" According to Eugene, Sirotzke said, "It depends on how

much money you can come up with." From his reply, Eugene understood that Sirotzke was seeking money to be applied towards the loans. Eugene further testified that he told Sirotzke that he had roughly $4,300, an amount that would satisfy all his outstanding installment payments. Eugene said he was told that such a payment would simply "buy [him] some more time." By allowing Eugene more time, the Bank did not clearly demonstrate an intention to waive its acceleration rights.

On April 2, 1984, Eugene went to the Bank and, at the teller window, paid the Bank roughly $4,300. According to Eugene's testimony, the payment represented five payments on the commercial loan; three payments on the unsecured loan; and three payments on the mortgage loan. Eugene understood that the effect of this transaction was to bring him up to date with respect to the installment payments which were due on the three loans (the assumption being the Bank waived its right to full payment on all three loans per the acceleration provision of the agreement). While it is true that a Bank employee accepted the payments and issued receipts for them, no evidence was offered which indicated that the employee did so knowing the circumstances surrounding the Bank's right to accelerate and that he accepted the installment payments with the intention of waiving such a right. See *Ferrero*, 309 Ill. 476 (even though financier accepted monthly dues after a member attempted suicide, the right to forfeit a benefit certificate was not waived because there was no evidence tending to show she knew of the suicide attempt and accepted payment in recognition of the continued validity of the certificate).

In a notice of public sale dated April 4, 1984, the Bank expressed its intention to conduct a sale of the collateral. Such conduct on the part of the Bank clearly does not evidence an intention to waive its acceleration

rights. After a meeting with Eugene and his attorney, the Bank continued the sale so that Eugene could either refinance or sell the condominium. Again, this demonstrates that the Bank was still seeking the full balance on all three loans. The Bank merely delayed its acceleration rights so that a foreclosure sale could be avoided. In fact, Eugene testified that he desired some time so that he could "pay the loan *off*." (Emphasis added.) However, Eugene was unsuccessful in his effort to dispose of the condominium and he was only able to pay the Bank $1,000 on April 19, 1984, and $967.76 on May 10, 1984.

Thereafter, a second notice of public sale, dated May 10, 1984, was mailed wherein the collateral was scheduled for sale on June 1, 1984. Clearly, the act of mailing such a notice indicates that it was the Bank's intention to assert its acceleration rights under the agreement.

This court agrees with the trial court's finding:

"THE COURT: Plaintiffs' claim of waiver is not supported by the evidence ***. Plaintiffs clearly were in default on all of their—all three notes in October of '83 and the defendant clearly and appropriately accelerated the payments due.

Thus the [B]ank was, in 1983 and 1984, entitled to insist, not on current payments, but payment in full on the obligations.

Never once in his meetings with Eugene Ryder did *** Sirotzke[ ] *** say anything other than the [B]ank wanted payment in full on all loans.

\* \* \*

The defendant was agreeing to accept payments to give Ryder more time to raise the money to pay off in full and to avoid the UCC sale, but I find the defendant did not ever, after October of 1983, agree to anything less than full payment under its right to acceleration."

The trial court's finding on waiver was not against the manifest weight of the evidence.

For the reasons set forth above, the judgment of the appellate court is reversed. Because of the appellate court's disposition of the appeal in this matter, several issues raised therein were not addressed by that court. Therefore, this cause is remanded to the appellate court for further consideration of those issues.

*Appellate court reversed;*
*cause remanded.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.