**David R. HERZOG, Trustee in Bankruptcy, Plaintiff–Appellant,**

v.

**LEIGHTON HOLDINGS, LTD., and Cecil R. McNab, Defendants–Appellees.**

**No. 97–C–8878.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 14, 1999.

---

498

499

**500**

Jack B. Schmetterer, Wayne E. Nelson, Chicago, IL, David Alan Belofsky, Douglas Merrill Belofsky, Steven Shamash, David A. Belofsky & Associates, P.C., Chicago, IL, for Litigant.

Neal L. Wolf, Janet Steffes Baer, Todd L. Padnos, Bryan R. Sup, Schwartz, Cooper, Greenberg & Krauss, Chicago, IL, for Leighton Holdings, Ltd., Cecil R. McNab.

Alan Philip Solow, Oscar L. Alcantara, Goldberg, Kohn, Bell, Black, Rosenblom & Moritz, Ltd., Chicago, IL, for Rafael Rios–Rodriquez.

## MEMORANDUM OPINION

GRADY, Senior District Judge.

Plaintiff has appealed the bankruptcy court's judgment for defendants on partial findings. For the reasons explained below, the bankruptcy court's judgment is affirmed.[1]

## BACKGROUND

Kids Creek Partners, L.P. ("KCPLP"), is a Michigan limited partnership and the debtor in the Chapter 7 bankruptcy case that gives rise to this appeal. Plaintiff–Appellant David R. Herzog ("Herzog" or the "Trustee") is KCPLP's bankruptcy trustee. Defendant–Appellee Leighton Holdings, Inc. ("Leighton") is a Cayman Islands corporation. Defendant–Appellee Cecil R. McNab ("McNab") is a California attorney who is Leighton's investment manager.

The case arises out of the failed redevelopment of the "Commons," approximately 450 acres of land located in Traverse City, Michigan. The Commons had previously housed the Traverse City Regional Psychiatric Hospital. In March 1991, the City of Traverse City entered into a consulting agreement with Richard R. Murray ("Murray"), an Illinois attorney, and his wholly-owned corporation, Ross Development Company ("Ross"), to aid in the proposed redevelopment of the Commons. In June 1991, a Traverse City civic group formed the Grand Traverse Commons Redevelopment Corporation ("GTCRC") for the purpose of acquiring title to the Commons.

In the spring of 1992, Carl Groesbeck ("Groesbeck"), who was then employed at the Baldwin Development Company ("Baldwin"), learned of the project to redevelop the Commons. Groesbeck left Baldwin and began to discuss his personal interest in developing the Commons with Murray and Ross. He also discussed that possibility with GTCRC. With the aid of James Adams ("Adams"), a Michigan attorney, Groesbeck created three entities: Mainstream (an Illinois corporation of which Groesbeck was president, director, and primary shareholder), Kids Creek Development Company ("KCDC") (a Michigan corporation of which Groesbeck was president), and KCPLP (of which Groesbeck was one of the limited partners). KCPLP was capitalized in the amount of $1000, $10 of which was contributed by Groesbeck. KCPLP had three other limited partners: Andrew McGhee ("McGhee") (who contributed the other $990), Rafael Rios–Rodriguez ("Rios") (an Illinois resident who attended law school with McNab), and Robin A. Schabes ("Schabes") (an Illinois resident who had been previously associated with Rios).

---

1. We decline plaintiff's request for oral argument. We need not allow oral argument where "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Fed. R.Bankr.Proc. 8012; *Matter of Thirtyacre,* 36 F.3d 697, 701 (7th Cir.1994). We believe that the briefs, which total 298 pages, more than adequately cover the issues presented.

Later that fall, Groesbeck sought financing for the project. To that end, he contacted two contractors, Robert Camp ("Camp") and Thomas Sourlis ("Sourlis"). In exchange for promissory notes, Groesbeck and Mainstream obtained a $10,000 loan from Camp and a $50,000 loan from Sourlis. Camp's note stated, "The Holder makes this note, and other consideration, to be able to participate in the Grand Traverser [sic] Commons Project and derive proportionate benefits thereof as a participant in the development and Limited Partnership established by Maker for same." Sourlis's note stated, "Holder makes this note to be able to convert this note into a proportionate share and participate as a Limited Partner in Kid's [sic] Creek Partners, Limited Partnership, a Michigan Limited Partnership established by Maker for the GRAND TRAVERSE COMMONS project, and enjoy the benefits thereof as an investor." Camp subsequently loaned another $5,000 to Groesbeck, bringing his total contribution to $15,000.

During the fall, both Groesbeck and Rios unsuccessfully tried to obtain other financing for the Commons project. Meanwhile, Groesbeck went forward with his redevelopment efforts. He sent a letter to Murray to confirm that Ross would have an equity interest in the project. On behalf of Mainstream, Groesbeck signed two promissory notes that each obligated it to pay $50,000 to GTCRC. One of these notes was personally guaranteed by Camp. Mainstream also entered into a development services agreement with Ross. GTCRC entered into an Exclusivity Agreement with KCPLP that granted KCPLP the exclusive right for six months to propose a redevelopment plan and to negotiate the form and content of a formal agreement. The agreement also provided

that, as a condition to entering into a formal redevelopment agreement, KCPLP had to submit a financial statement showing that it or its affiliates had a net worth of at least four million dollars.

To bring all of these plans together, however, Groesbeck still needed funding. To accomplish this goal, Groesbeck solicited Leighton. McNab, a law school classmate of Rios, was seen as Groesbeck's best opportunity to secure financing from Leighton. After receiving letters, viewing the Commons, and meeting with Groesbeck, McGhee, Rios, and others, McNab decided that Leighton would loan money to KCPLP.

On January 21, 1993, Leighton and KCPLP executed a Loan and Security Agreement ("LASA One"). LASA One provided for Leighton to loan KCPLP a total of $350,000 in three installments, provided that KCPLP met certain conditions: (1) no "Event of Default" (which included the submission of any untrue or incorrect document delivered pursuant to the agreement) or "Unmatured Event of Default" took place, (2) KCPLP's representations continued to be true, (3) KCPLP continued to comply with certain covenants and requirements, and (4) that no material adverse change occurred to the financial condition, operations, or business of KCPLP. LASA One stated that the loan would convert to a revolving credit facility upon the "Conversion Date," the date when KCPLP obtained title to the Commons, provided that no "Unmatured Event of Default" or "Event of Default" had occurred. The agreement also required Leighton to cause an entity worth at least four million dollars to become associated with KCPLP so that it could meet its obligations under the Exclusivity Agreement with GTCRC.[2]

---

**2.** The bankruptcy court found that "LASA One also provided that Leighton would cause an entity worth at least four million dollars to *become affiliated* with the Debtor so as to comply with KCPLP's obligations under the Exclusivity Agreement." *In re Kids Creek*

*Partners, L.P.,* 212 B.R. 898, 911 (Bankr. N.D.Ill.1997) (emphasis added). The special covenant at issue in LASA One, however, required only that Leighton "would cause an entity with a net worth of $4,000,000 or more ... to become associated with" KCPLP.

On May 3, 1993, McNab sent a letter to Mainstream (the "Affiliation Letter") with the purpose of satisfying this requirement. The letter stated that Leighton was "affiliated" with Lakeside Partners ("Lakeside"), a limited partner in KCPLP.[3] It did not state that Leighton was an affiliate of KCPLP, nor did it state that Leighton was a creditor of KCPLP.

On May 5, 1993, Adams (KCPLP's attorney) sent the Affiliation Letter to GTCRC, along with a cover letter:

> At my client's request, here is a copy of the financial statement of Leighton Holdings, Ltd., the parent of Lakeside Partners, which in turn is the senior limited partner, and an affiliate, of Kids Creek Partners Limited Partnership. As you will see, the statement reflects a net worth which we believe exceeds the minimum net worth requirements set forth in the Exclusivity Agreement.

Two days later, McNab authorized the transfer of $51,203 to KCPLP, completing Leighton's requirements under LASA One. He did so despite the fact that some milestones required by the agreement (including legal transfer of title, execution of the Master Lease, and execution of a formal redevelopment agreement with GTCRC) had not been satisfied. In addition, some of the financial statements submitted by KCPLP were in error, because they understated KCPLP's liabilities. On May 27, 1993, KCPLP and the GTCRC entered into a formal Redevelopment Agreement.

In the following months, Leighton and KCPLP arranged for additional loans. On June 17, 1993, the parties executed LASA Two, which provided for a loan of $522,000 and gave both McNab and Lakeside interests in Mainstream. Again, the accompanying financial statements submitted by KCPLP were incorrect. Meanwhile, the Michigan Legislature approved the conveyance of the Commons to GTCRC. The

parties amended the partnership so that Rios, Schabes, McGhee, Lakeside, and McNab would all have limited partnership interests in KCPLP.

Throughout 1993, unbeknownst to McNab or Leighton, KCPLP encountered another problem. Richard Murray, who had discussed the redevelopment of the Commons with Groesbeck in early 1992, claimed that Groesbeck had orally agreed to give him (or his development company, Ross) an equity interest in the project. After failed negotiations, Murray filed suit against Mainstream and Groesbeck. KCPLP did not disclose the dispute to McNab or Leighton until after both LASA One and LASA Two were executed.

In the following months, the project moved forward. On September 3, 1993, KCPLP and GTCRC entered into a "Master Lease" for the Commons that would take effect once GTCRC received title to the site. On November 15, 1993, the Michigan legislature transferred title to GTCRC. Throughout this period, KCPLP was still having difficulty raising money, and a variety of its attempts failed. So KCPLP turned to Leighton for further financing.

On September 30, 1993, Leighton and KCPLP entered into LASA Three, which accelerated the timetable for payments under LASA Two. In exchange, Lakeside's interest in Mainstream increased. On November 2, 1993, the parties entered into their final amended loan and security agreement, LASA Four. Leighton agreed to loan an additional $2 million to KCPLP, bringing the total loan to $2.9 million. LASA Three and LASA Four each expressly acknowledged the existence of the Murray litigation.

On December 9, 1993, KCPLP granted Leighton a mortgage on its interest in the Commons. The mortgage was recorded on December 14, 1993. Had no "Events of

---

**3.** Lakeside is a California general partnership of which McNab is a general partner. It has

no written partnership agreement.

Default" or "Unmatured Events of Default" occurred, that day would have served as the Conversion Date under LASA One. Leighton and McNab have alleged, and the bankruptcy court has found, that KCPLP committed several defaults on LASA One. Leighton's allegations include a failure to disclose the notes held by Camp and Sourlis, submission of incorrect financial statements, failure to deliver monthly financial statements, failure to disclose Murray's equity interest in KCPLP, failure to disclose the existence of the Murray litigation, failure to obtain the dismissal of the Murray litigation, failure to make interest payments, and improper "upstreaming" of funds to Mainstream.

On January 10, 1994, Leighton's attorney, Andrew Connor, came to Mainstream's offices in Chicago to meet with Groesbeck, McGhee, Rios, and Schabes. He brought with him a draft default letter that detailed the events of default Leighton believed had occurred. It further stated that Leighton was suspending its commitment to fund further advances on the loan. In the following months, the parties attempted to negotiate another amended loan agreement. In the midst of these negotiations, KCPLP announced that it would dissolve at the end of the year in order to avoid tax liability that KCPLP partners would otherwise incur as a result of the sale of the Medical Campus, a portion of the Commons site. On May 26, 1994, Leighton served KCPLP with a formal default letter and demanded immediate payment of the outstanding loans.

On December 5, 1994, Murray filed involuntary Chapter 7 bankruptcy petitions against KCPLP, Mainstream, and KCDC. On February 15, 1995, the Trustee filed this adversary proceeding against Leighton, McNab, Rios, and Schabes, which included the following Counts: Count I (Equitable Subordination), Count II (Recharacterization of Debt as Equity), Count III (Breach of Contract), Count IV (Breach of Fiduciary Duty), and Count VII (Inducing Breach of Fiduciary Duty).

On December 2, 1996, the bankruptcy court entered a "Final Pretrial Order," which provided for a close of discovery on June 2, 1997, and set the case for trial on June 16, 1997. On June 2, 1997, Plaintiff moved to reset the discovery and trial schedule. The bankruptcy court denied the motion. Plaintiff also moved to preclude Leighton from attempting to prove certain issues related to defaults because Leighton had not yet produced a witness for deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Rather than delay the trial, the bankruptcy court fined McNab (the 30(b)(6) designate) $2,500 for being evasive, and ordered his deposition to be taken immediately prior to trial. The trial began on June 23, 1997. At the close of plaintiff's case, defendants moved for partial findings. The bankruptcy court granted defendants' motion and entered judgment on all counts in their favor.

Plaintiff now appeals the bankruptcy court's ruling as to Counts I and III only.

### STANDARDS OF REVIEW

This court applies a *de novo* standard of review to the bankruptcy court's conclusions of law. *See Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir.1994). We may reverse the bankruptcy court's findings of fact, however, only if they are clearly erroneous. Fed.Rule Bankr.Proc. 8013. To be clearly erroneous, a decision must be "more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987, 990 (7th Cir.1998) (citation omitted). Motions for continuances are subject to an abuse of discretion standard. *See Matter of Narowetz Mech. Contractors, Inc.*, 898 F.2d 1306, 1309 (7th Cir.1990). An abuse of discretion occurs "where no reasonable person could take the view adopted by the trial court." *McClain v. Owens–Corning Fiberglas Corp.*, 139 F.3d 1124, 1126 (7th Cir.1998).

## DISCUSSION

Plaintiff presents three issues for our review: (1) whether the bankruptcy court erred in finding that the Trustee failed to prove that Leighton engaged in conduct that justified equitable subordination of its secured claim; (2) whether the bankruptcy court erred in finding that the Trustee failed to prove his breach of contract claim; and (3) whether the bankruptcy court erred in denying the Trustee's motions for an emergency continuance and for sanctions. We address each in turn.

## I. Equitable Subordination

The bankruptcy court held that the Trustee had not offered proof sufficient to satisfy the legal standard necessary to subordinate Leighton and McNab's claims under the loan agreement. The Trustee now argues that the bankruptcy court applied the wrong legal standard and committed clear error in its findings of fact.

### A. Proper Legal Standard

■ The Trustee first argues that the bankruptcy court applied the wrong legal standard to the determination of whether Leighton's claim was subject to equitable subordination, or placing Leighton's claim to KCPLP's assets at the end of the line.[4] The bankruptcy court found that, "[a]s neither Leighton nor McNab were insiders of Debtor, the standard for equitable subordination applicable here is egregiousness and severe unfairness in relation to the other creditors." *Kids Creek*, 212 B.R. at 930 (citation omitted). The Trustee argues that the bankruptcy court should have applied the balancing test set forth in *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.1977): "The court should con-

sider whether (1) the claimant creditor has engaged in some sort of inequitable misconduct; (2) the misconduct has resulted in injury to other creditors or in unfair advantage to the miscreant; and (3) subordination of the debt is inconsistent with other provisions of the bankruptcy code." *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1237 (7th Cir.1990). We review this question *de novo*.

■ Essentially, we can boil down this complicated inquiry to a single question: Does the *Mobile Steel* balancing test apply with equal force to non-insiders as it does to insiders?[5] We hold that it does not. We agree with the bankruptcy court judges of this district who have distinguished between insiders and non-insiders in determining which test to apply. *See, e.g., In re Badger Freightways, Inc.*, 106 B.R. 971, 976 (Bankr.N.D.Ill.1989) (citations omitted) ("If a claimant is not a fiduciary, its claim may still be equitably subordinated, but courts have required the claimant's conduct to be much more egregious."); *In re Aluminum Mills Corp.*, 132 B.R. 869, 896 (Bankr.N.D.Ill.1991) (citation omitted) ("If the creditor is not a fiduciary, equitable subordination may still be applied, but the conduct must be much more egregious.").

■ We follow closely the opinion in *Alper–Richman*, in which a bankruptcy court judge aptly reconciled the *Mobile Steel* test with the Seventh Circuit's holding in *Kham & Nate's Shoes*. *See In re Alper–Richman Furs, Ltd.*, 147 B.R. 140, 152 (Bankr.N.D.Ill.1992) (citations omitted). After setting forth the *Mobile Steel* test, the *Alper–Richman* court found:

cludes any person who is a director, officer, person in control, or general partner of the debtor. It also includes any relatives of those insiders and any partnership in which the debtor is a general partner. *See* 11 U.S.C. § 101(B). Finally, it includes any "affiliate, or insider of an affiliate as if such affiliate were the debtor" and any managing agent of the debtor. *Id.* at § 101(E), (F).

---

**4.** "Equitable subordination of a claim moves the creditor down in the order of payment out of the assets in the bankruptcy estate, generally reducing (or eliminating) the amount the creditor can recover." *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 341 (7th Cir. 1997).

**5.** Under the Bankruptcy Code, the term "insider" (as applied to debtor corporations) in-

The caselaw dealing with equitable subordination of claims in bankruptcy draws a sharp distinction between equitable subordination of the creditor claims of insiders and equitable subordination of the claims of creditors who are not insiders. *Kham and Nate's Shoes No. 2 v. First Bank,* 908 F.2d 1351, 1356 (7th Cir.1990). Thus, if the Trustee can show that the [non-insider Creditor] was in a position where it exercised control over the Debtor such that it owed a fiduciary relationship to the Debtor and its creditors, and its conduct breached that relationship, the [Creditor's] claim will be equitably subordinated. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). However, if the [Creditor] was not an insider with respect to the Debtor, see § 101(31), its claim will only be equitably subordinated if the [Creditor] was guilty of "gross misconduct" in its dealings with the Debtor. *Kham and Nate's,* 908 F.2d at 1357; *In re Badger Freightways, Inc.,* 106 B.R. 971, 977 (Bankr.N.D.Ill.1989).

*Alper–Richman,* 147 B.R. at 152. On appeal, the Trustee has made no claim that Leighton was an insider or had a fiduciary relationship with the KCPLP. Accordingly, the "gross misconduct" standard applies. And courts have equated that standard with egregiousness. *See, e.g., Badger Freightways,* 106 B.R. at 976–77.

◼ Like the court in *Alper–Richman,* the bankruptcy court in this case did not wholly reject the *Mobile Steel* test. First, the court set forth the three-prong *Mobile Steel* test, as adopted by the Seventh Circuit: "(1) Did the creditor engage in some sort of inequitable conduct? (2) Did that misconduct result in injury to other creditors or some unfair advantage on the claimant? (3) Would subordination of the debt be inconsistent with other provisions of the Code?" *Kids Creek,* 212 B.R. at 928 (citing *Vitreous Steel,* 911 F.2d at 1237). Later in the opinion, the court held that the first prong places a higher standard on parties seeking to subordinate non-insid-

ers. It held that to subordinate an insider one must prove only simple unfairness, while to subordinate a non-insider one must prove egregiousness and severe unfairness. *Kids Creek,* 212 B.R. at 928. So, while the Trustee correctly points out that, under the mandate of *Mobile Steel,* "subordination depends on a combination of inequitable conduct, unfair advantage to the creditor, and injury to other creditors," *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir.1990), it is equally true that the seriousness of the inequitable conduct that must be proven depends upon whether the alleged wrongdoer is an insider. *See In re Giorgio,* 862 F.2d 933, 938–39 (1st Cir. 1988) (recognizing that courts apply the "egregious and severely unfair" standard to non-insiders when applying the first prong of the *Mobile Steel* test).

◼ Accordingly, the egregiousness test used by the bankruptcy court in this case does not conflict with the *Mobile Steel* test, but rather applies it with specificity. This application does not conflict with the Seventh Circuit's flexible approach to subordination. The Seventh Circuit has mandated a "case-by-case inquiry," *Vitreous Steel,* 911 F.2d at 1237, that requires a court to "look to the origin and nature of the unsecured claim and decide whether equity requires that it be subordinated to claims of other general unsecured creditors." *Matter of Envirodyne Indus., Inc.,* 79 F.3d 579, 582 (7th Cir.1996). The egregiousness test merely implements this approach; it does not conflict with it.

◼ Finally, we note that the Trustee has not properly preserved his claim on this issue. The Trustee proposed the following conclusion of law to the bankruptcy court:

The record, moreover, clearly establishes fault on LHL's part which justifies subordination of its claims. When evaluating fault-based equitable subordination of a lender's claim, a critical question is whether or not the claimant is an insider or a fiduciary of the debtor. If

so, the burden lies with the claimant to prove the fairness of the transactions at issue. *In re Octagon Roofing,* 141 B.R. 968 (Bkrtcy.N.D.Ill.1992). If not, then equitable subordination is appropriate only if the claimant's misconduct was egregious; not just "sharp dealing," but gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others. *Badger Freightways,* 106 B.R. 971 at 976.

Because the Trustee did not dispute the application of the egregiousness test to a non-insider (and indeed proposed it), the bankruptcy court did not have occasion to consider the argument the Trustee is advancing on appeal. The argument has been waived, and the waiver provides an alternative ground for our affirming the bankruptcy court on this question of law.

### B. Factual Issues

Having found that the bankruptcy court applied the correct legal standard, we must determine whether the court's factual findings were clearly erroneous. The court found that neither Leighton nor McNab engaged in behavior that was sufficiently egregious and unfair to warrant equitable subordination under the first prong of *Mobile Steel.* The Trustee argues that the court committed clear error when it failed to find that Leighton and McNab committed gross misconduct by fraudulently submitting the Affiliation Letter and by suspending funding on the pretext that KCPLP had defaulted on the loan agreements.

### 1. Fraud

■ The Trustee argues that the bankruptcy court committed clear error when it failed to find that Leighton and McNab committed fraud when they submitted the Affiliation Letter and accompanying financial statements to GTCRC.[6] The bankruptcy court did not specifically address the issue of fraud, but it did make a finding of fact regarding the submission of these documents to GTCRC:

82. On April 19, 1993, McNab faxed Rios a letter to Mainstream for the purpose of complying with Leighton's obligation under LASA One and KCPLP's obligation under the Exclusivity Agreement to "cause an entity worth $4 million to become associated with the Borrower" (the "Affiliation Letter"). In this letter, McNab attached an account summary from the Bermuda Trust Company that showed Leighton's cash holdings in excess of $4 million. It was not stated in the letter or financial statement that Leighton was a creditor of KCPLP. This letter represented that Leighton was an "affiliate" of Lakeside. McNab prepared financial statements to accompany the Affiliation Letter. These financial statements listed assets of $1,200,000 in Lakeside Partners Limited Partnership shares. McNab knew this information was going to be transmitted to the GTCRC for the purpose of KCPLP's compliance with the Exclusivity Agreement.

*Kids Creek,* 212 B.R. at 915. An examination of the evidence shows that the bankruptcy court did not commit clear error in rejecting the Trustee's contention that Leighton and McNab had committed fraud.

First, the Trustee alleges that Leighton committed fraud by representing to the

---

6. The Affiliation Letter states:

The undersigned is the business advisor and agent for Leighton Holdings, Ltd. Leighton Holdings, Ltd. is affiliated with Lakeside Partners, which is a limited partner in Kids Creek Partners Limited Partnership.

Further to your request, please find attached herewith a balance sheet as of 19 April 1993 of Leighton Holdings, Ltd. The balance sheet accurately reflects the finan-

cial condition of Leighton Holdings, Ltd. as of the stated date. As supporting documentation, please find attached to the balance sheet a copy of the Leighton Holdings, Ltd. bank statement dated 19 April 1993. The secured loans receivable all are promissory notes secured by trust deeds against real property in southern California. Leighton Holdings, Ltd. has no outstanding liabilities of any kind.

GTCRC that it had a 12.67% partnership interest in Kids Creek, worth $1,200,000. Were this an accurate valuation, the argument goes, then KCPLP would have a total worth of $9,471,191.79. According to the Trustee, this figure grossly overestimates the true value of KCPLP at that time. But McNab sent the Affiliation Letter, along with this financial data, to KCPLP, not GTCRC. Then KCPLP's attorney, Adams, sent the letter (accompanied by his own cover letter) to GTCRC. KCPLP cannot derive the benefits of this valuation (which included convincing GTCRC to enter into the Redevelopment Agreement) and then claim that Leighton and McNab somehow defrauded GTCRC when the development turned sour. When KCPLP passed along the data to GTCRC, it was in a position superior to Leighton to gauge its own value. It cannot now claim that this alleged inaccuracy amounts to fraud on Leighton's part when it was essentially KCPLP itself that made the representation to GTCRC.

Second, the Trustee argues that McNab and Leighton committed fraud by representing to GTCRC that Leighton was "affiliated with Lakeside Partners, which is a limited partner in Kids Creek Partners Limited Partnership." Again, the Trustee faces the problem that it was KCPLP, not Leighton, that sent the letter to GTCRC. Even though the Trustee has attempted to show that Leighton wanted GTCRC to infer that Leighton's support allowed KCPLP to meet the $4 million capitalization requirement of the Exclusivity Agreement, it was KCPLP's Adams, not McNab or Leighton, who wrote in his cover letter, "As you will see, the statement reflects a net worth which we believe exceeds the minimum net worth requirements set forth in the Exclusivity Agreement."

More important, the Trustee apparently does not dispute the representation that Leighton and Lakeside were in fact affiliated, but complains only that Leighton failed to disclose to GTCRC that it was KCPLP's lender. Without a duty to dis-

close to GTCRC (and the Trustee has made no argument suggesting such a duty existed), such an omission cannot constitute fraud. Moreover, evidence suggests that GTCRC knew that Leighton had lent money to KCPLP. Adams sent a letter to GTCRC informing it that "Leighton is, to date, the principal venture capital lender for KCP and the project." While the parties dispute the possible meanings of the term "principal venture capital lender," we are not persuaded that the bankruptcy court committed clear error in failing to find this omission in the Affiliation Letter to be fraudulent.

In short, we find that the Trustee's evidence falls well short of proving that Leighton and McNab committed fraud on GTCRC when they sent the Affiliation Letter to KCPLP. The bankruptcy court's refusal to subordinate Leighton's claims for fraud was not clearly erroneous.

## 2. Defaults

■ The Trustee also argues that Leighton's termination of the loan agreement represents inequitable conduct sufficient to justify subordinating Leighton's claims. Leighton terminated the agreement because it believed that KCPLP was in default. The bankruptcy court found that KCPLP was indeed in default:

> Debtor itself had breached a number of provisions of the loan agreement, and at the end of December 1993, Murray and Ross filed an amended complaint that made a number of allegations against Groesbeck and which added McNab and Leighton as defendants. Moreover, the evidence tended to show that it was near the end of 1993 when McNab learned of the asserted interests of Camp and Sourlis. The evidence tended to show that McNab and Leighton justifiably felt that Debtor was mismanaged and had deceived them as to asserted ownership interests of third parties, and also as to financial information. They also lost faith in Groesbeck's abilities. Therefore, Leighton's lawyer showed a draft de-

fault letter as a warning and basis for discussion which resulted in negotiations. It was only when Debtor announced it was dissolving at the end of 1994 and the venture was clearly in a state of collapse that Leighton issued a formal notice of default. While it is true that the mortgage was recorded one month prior to the draft notice of default and zoning was approved shortly before the final notice of default, the preponderance of evidence showed that it was the mismanagement of Debtor and its several breaches as well as its imminent dissolution that led to Leighton's final decision to cease of funding.

*Kids Creek,* 212 B.R. at 930–31. These findings adequately explain grounds for default.

■ Although the Trustee argues that Leighton asserted KCPLP's defaults as a pretext to cease providing funding for the project, Leighton's intentions are irrelevant: "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' " *Kham & Nate's Shoes,* 908 F.2d at 1357. To the extent that KCPLP actually defaulted on the loan agreements, Leighton's decision to cease funding was justified, regardless of its motivation.

We will not disturb the bankruptcy court's factual findings that KCPLP did indeed, in several ways, default on its loan agreements with Leighton. A single Event of Default, or Unmatured Event of Default, by KCPLP, would justify the termination of Leighton's obligations under the loan agreement; several such events occurred. Indeed, in a March 14, 1994, letter to Leighton's attorney, Andrew Connor, Groesbeck acknowledged that KCPLP was in default.

For instance, KCPLP had received $85,000 in loans from Camp and Sourlis before it signed LASA One with Leighton. KCPLP did not disclose any information about Camp and Sourlis to Leighton. The Trustee now argues that the loans were made to Groesbeck and Mainstream, not to Kids Creek. He contends that KCPLP had no duty to disclose under the loan agreement because neither Mainstream nor Groesbeck gave Leighton any warranties, and they are entities separate from KCPLP. But the loan agreement required KCPLP to disclose the existence of equity interests in it, and Camp and Sourlis asserted such interests. Groesbeck had provided Sourlis with a note that was, as the bankruptcy court found, "expressly convertible" into an equity interest in the Commons project. *Kids Creek,* 212 B.R. at 934. The note Groesbeck provided to Camp, while more ambiguous, also supports the bankruptcy court's findings that the "carelessly worded" interest should have been disclosed to Leighton. Therefore, the finding of the bankruptcy court that the loan agreement required disclosure of Camp and Sourlis' interests was not clearly erroneous.

The bankruptcy court made several other findings regarding KCPLP's non-performance under the loan agreement. It found that KCPLP submitted incomplete and partially inaccurate financial statements to Leighton. It found that the financial statements did not fully disclose KCPLP's practice of "upstreaming" funds from KCPLP to Mainstream. This finding was not clearly erroneous.[7]

■ The bankruptcy court also found that Leighton did not take advantage of KCPLP, which alone provides grounds for judgment against KCPLP. In its weakest formulation, equitable subordination requires "breach *plus* some advantage-taking." *Kham & Nate's Shoes,* 908 F.2d at

---

7. We note that, because several of these failures constituted Unmatured Events of Default throughout the time period at issue, the "Conversion Date," which would have relieved KCPLP of it responsibility to abide by several of these "Negative Covenants," never occurred.

1357 (emphasis in original). Even had KCPLP not been in default, subordination of Leighton's claims would require the Trustee to show that Leighton had engaged in conduct that not only breached the agreement, but was also inequitable. Here, Leighton provided KCPLP with several months to cure many of its errors. Leighton waited until KCPLP had announced its dissolution before it called in KCPLP's outstanding debt. The bankruptcy court found that Leighton's position was justifiable given KCPLP's situation, and it had not ceased advancing funds under any improper pretext. Because this finding was not clearly erroneous, we will not disturb it.

## C. Waiver

 The Trustee also argues that Leighton waived its claims under the loan agreement by granting additional loans after it had discovered some of the defaults. As the bankruptcy court noted, waiver is the intentional relinquishment of a known right. *See Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 104–05, 165 Ill.Dec. 650, 585 N.E.2d 46, 49 (1991). The party claiming waiver must show a "clear, unequivocal, and decisive act" showing such waiver. *Id.* A party may also impliedly waive a claim if its behavior shows such a clear intention. *See id.*

 Here, the Trustee relies on little more than the fact that Leighton and McNab were aware of the alleged defaults before Leighton advanced additional funds to KCPLP. The bankruptcy court found that the mere continued advancement of money did not show the clear intent required to constitute waiver. The Trustee gives us no reason to find that the bankruptcy court committed clear error in this regard.

\* \* \* \* \* \*

The bankruptcy court found that Leighton and McNab's conduct was not sufficiently inequitable to justify subordination. That finding was not clearly erroneous.

Accordingly, because the Trustee has failed to meet the first prong (as modified for non-insiders) of the *Mobile Steel* test, we need not address the second and third prongs. The bankruptcy court's denial of the Trustee's equitable subordination claim is affirmed.

## II. Breach of Contract

The bankruptcy court also found that the Trustee failed to prove that Leighton or McNab breached the loan agreement. The Trustee now argues that the bankruptcy court erred because Leighton's discontinuation of funding was not justified by any material breach by KCPLP. We have already addressed that argument above. To prove a breach of contract claim, the Trustee had to show: (1) that a contract existed between KCPLP and Leighton, (2) that KCPLP performed all of its obligations under that contract, (3) that Leighton breached the contract, and (4) that KCPLP suffered damages due to the breach. *See Nielsen v. United Servs. Auto. Ass'n*, 244 Ill.App.3d 658, 662, 183 Ill.Dec. 874, 612 N.E.2d 526, 529 (1993). Because the bankruptcy court's finding that KCPLP did not perform its obligations under the loan agreement was not clearly erroneous, as we discussed above, the Trustee's breach of contract claim must fail.

The Trustee further argues that Leighton breached its "Special Covenant of the Lender" by failing to provide an entity with a net worth exceeding four million dollars "to become associated" with KCPLP. But again, even if Leighton did not become associated with KCPLP (a question of fact to which the bankruptcy court provided no clear answer), KCPLP's non-performance excused that responsibility. The Trustee himself refers to "Kids Creek's open and obvious failure to comply with the most material provisions of the loan agreement." Appellant's Brief at 107. As discussed above, such breaches relieved Leighton from its obligations.

Finally, as we have already indicated, Leighton did not waive its claims of default. The bankruptcy court's holding that the mere advancement of funds did not constitute waiver was not clearly erroneous. It is true that LASA One states that "the making of any Advance under this Agreement shall be subject to the satisfaction" of the agreement's conditions. But it also states that the "Lender shall not (by act, delay, omission or otherwise) be deemed to have waived any of its rights or remedies hereunder, or any provision hereof, unless such waiver is in writing signed by the Lender." The loan agreement's requirement of a writing for a valid waiver is consistent with an intention that advancements of money would not be deemed implied waivers.[8] Leighton's election to continue advancing funds after certain defaults came to light may simply have been an attempt to get the Commons project back on track for a mutually beneficial outcome. It was not conduct that clearly indicated a waiver of Leighton's rights.

## III. Trial Scheduling

Finally, the Trustee argues that the bankruptcy court abused its discretion in denying a motion for a continuance, selectively enforcing a scheduling order, and not sanctioning Leighton for failing to provide discovery. We find no merit in the Trustee's arguments.

On December 2, 1996, the bankruptcy court entered an order closing all discovery on June 2, 1997.[9] The Trustee moved to extend discovery on the day discovery closed, citing hardship. The Trustee now complains that he was "required to engage in discovery *even while the trial was pro-*

*ceeding.*" Appellant's Brief at 112 (emphasis in original). He argues that "it was obvious on June 2, 1997 that the deadlines set in the bankruptcy court's December 2 Order could not reasonably be met." *Id.* at 114.

The circumstances surrounding the bankruptcy court's denial of the Trustee's motion, however, illuminate its rationale. The close of discovery occurred almost two and a half years after the filing of this case, six months after the cutoff was set. When it set the discovery cutoff, the bankruptcy court warned the parties, "I'm not changing the dates in this form ... We'll close discovery June 2, 1997 ... If you're not done by then, I think it will be due to somebody not coming in here to get an order to get relief to move a deposition along. You've got six months. Be finished by June 2." Still, the Trustee waited until the very day of the cutoff to ask for a significant continuance. Under these circumstances, we cannot find that the bankruptcy court abused its discretion by denying a continuance. We should not reverse a lower court's ruling "where there are no changed circumstances and a litigant fails to take advantage of opportunities to conduct discovery." *Daniel J. Hartwig, Assocs., Inc. v. Kanner,* 913 F.2d 1213, 1222–23 (7th Cir.1990).

Moreover, the bankruptcy court did not provide Leighton and McNab with an unfair advantage. The Trustee argues that the bankruptcy court "selectively enforced" deadlines. After allowing KCPLP to depose McNab, the Court allowed Leighton to take supplemental depositions. It granted a one week extension for the trial. But allowing additional discovery

---

8. Although we agree with the Trustee that an implied waiver can occur even in the face of a written waiver requirement, the lack of a written waiver in this case provides evidence to support the bankruptcy court's finding.

9. The Trustee argues that this order was not a "Final Pretrial Order," because the bankruptcy court did not hold a Rule 16 conference before entering the order. These conferences,

however, even if they did not occur, are discretionary. Moreover, even if the order was merely a scheduling order and not a "Final Pretrial Order," it could have been modified only by "a showing of good cause and by leave of the judge." Fed. R.Civ.P. 16(b). Here, as we discuss below, the court had made very clear that it did not want discovery to extend beyond June 2.

was within the bankruptcy court's discretion, and the Trustee has not shown that this choice was unreasonable. Moreover, the Trustee has failed to show how conducting discovery during the trial specifically prejudiced him. While conducting a trial and depositions simultaneously was probably inconvenient for the Trustee, it was also inconvenient for Leighton and McNab. Without a showing of unfair prejudice, we will not overturn scheduling decisions of the bankruptcy court, which are wisely left to its discretion.

 Similarly, we do not find that the bankruptcy court abused its discretion when it failed to sanction Leighton. As of June 2, 1997, Leighton had failed to provide a Rule 30(b)(6) designate to answer questions on behalf of the organization. The bankruptcy court ordered McNab to submit to a deposition immediately before trial and assessed a $2,500 fine for failure to provide timely discovery.

The Trustee now argues that he was prejudiced by McNab's "evasiveness" on issues central to the bankruptcy court's holdings. The bankruptcy court, however, acknowledged that McNab was "extremely evasive." *Kids Creek,* 212 B.R. at 905. Because of this, the court relied on the "part of his testimony [that] was corroborated by other witnesses, documentary evidence, pretrial stipulations of the parties, or by matters found ·undisputed following denial of Defendants' pretrial motion for summary judgment" to make its findings of fact. *Id.* We are satisfied that the bankruptcy court did not rely on McNab's uncorroborated testimony. In our own review of the evidence, as well, we note that the documents (for instance, the Camp and Sourlis notes) provide a basis for the bankruptcy court's finding of default. The Trustee did not suffer any unfair prejudice from the bankruptcy court's decision not to impose stronger sanctions, such as refusing to allow McNab to testify. There was no abuse of discretion.

### CONCLUSION

For the foregoing reasons, the bankruptcy court's decision is affirmed.