2020 IL App (1st) 190765

THIRD DIVISION
June 30, 2020

No. 1-19-0765

| | |
|---|---|
| GENEVA NORMAN, | ) |
| | ) Appeal from |
| Plaintiff-Appellee, | ) the Circuit Court |
| | ) of Cook County |
| v. | ) |
| | ) 2017-M1-126460 |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for Structured | ) |
| Asset Mortgage Investments II, Inc., Bear Stearns ALT-A Trust, | ) Honorable |
| Mortgage Pass-Through Certificates Series 2006-3, | ) Dennis M. McGuire, |
| | ) Judge Presiding |
| Defendant-Appellant. | ) |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant purchaser of a foreclosed Chicago apartment appeals from orders granting summary judgment, statutory damages, and attorney fees on the existing tenant's claim that the new owner failed to comply with an ordinance requiring it to offer relocation assistance or to continue the tenancy within 63 days of acquiring the property. See Chicago Municipal Code § 5-14-050 (amended Apr. 15, 2015). The new owner argues that the tenant waived her statutory claim by accepting the lease extension she was offered 187 days after the property changed hands. The new owner also contends that substantial compliance with the ordinance, rather than strict compliance, suffices and that the offer on the 187th day was substantial compliance. The new owner is also challenging the amount of attorney fees.

¶ 2    We have jurisdiction over the new owner's appeal from a final judgment of the trial court pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 3                                    I. BACKGROUND

¶ 4     Geneva Norman, the plaintiff-appellee, became a tenant of 655 West Irving Park Road, Unit #5202, Chicago, in 1993. She regularly renewed her lease, even after the apartment building converted to condominiums in 2003. Norman and her family were residing in the apartment in late 2014, when the condominium association obtained a court order assigning the unit owner's right to Norman's rent payments directly to the association. Shortly after that, the association entered into a month-to-month written lease with Norman, at a rate of $2187 per month. In early 2015, unbeknownst to Norman, the apartment unit became the subject of foreclosure proceedings. After proving its claim, the foreclosure plaintiff also became the owner of the property pursuant to a judicial sale that was approved on October 23, 2015. That plaintiff—U.S. National Bank Association, as Trustee for Structured Asset Mortgage Investments II, Inc., Bear Stearns Alt-A Trust, Mortgage Pass-Through Certificates Series 2006-3—refers to itself as "U.S. Bank," and we will do the same. U.S. Bank communicated with Norman after acquiring the property, but it was not until more than six months after the judicial sale that U.S. Bank offered to continue Norman's tenancy or provide the $10,600 relocation assistance that is set out in Chicago's "Protecting Tenants in Foreclosed Rental Property Ordinance." Chicago Municipal Code, § 5-14-010 (added June 5, 2013). The enactment is also known as the "Keep Chicago Renting Ordnance." *After Foreclosure for Chicago Residents*, Ill. Legal Aid Online, https://www.illinoislegalaid.org/legal-information/after-foreclosure-chicago-residents (last visited June 17, 2020) [https://perma.cc/JFS5-3RJ5]. Norman sued U.S. Bank for failing to comply with the ordinance and prevailed. Before addressing U.S. Bank's arguments on appeal, we briefly summarize the ordinance and the facts that led to the judgment in Norman's favor.

¶ 5    The ordinance was first enacted in mid-2013 due to the national mortgage foreclosure crisis that began in 2006 and what became the common practice of foreclosing lenders to quickly and indiscriminately evict any tenants. Chicago Municipal Code § 5-14-010 (added June 5, 2013); *Tenants in Foreclosure*, Ill. Legal Aid Online, https://www.illinoislegalaid.org/legal-information/tenants-foreclosure (last visited June 17, 2020) [https://perma.cc/9ZY7-HJZC]; *Protecting Tenants in Foreclosed Rental Property Ordinance*, Chi., https://www.chicago.gov/city/en/depts/bldgs/provdrs/inspect/alerts/2013/sep/_protecting_tenants inforeclosedrentalpropertyord.html (last visited June 17, 2020) [https://perma.cc/QKA3-TGCA].

¶ 6    The ordinance was amended in August 2015—shortly before U.S. Bank's purchase of the property in October 2015—to provide a specific timeline in which the new owner and the existing tenant are to communicate with each other and to require that the new owner provide a standardized information disclosure form about the renter's tenancy. More specifically, the ordinance specifies that the tenant of a foreclosed property "shall" be given notice of the change of ownership within 21 days of the change or within seven days of determining the tenant's identity. Chicago Municipal Code § 5-14-040(a) (amended Apr. 15, 2015). The new owner must deliver or mail the notice and also post the notice on the primary entrance of the foreclosed property. Chicago Municipal Code § 5-14-040(a), (c) (amended Apr. 15, 2015). Until that notice is given, the owner cannot collect rent or terminate a tenant's lease for failure to pay rent. Chicago Municipal Code § 5-14-040(d) (amended Apr. 15, 2015). The new owner is also required to pay a "qualified tenant" a one-time relocation assistance fee of $10,600, unless the new owner offers to renew or extend the rental agreement at a rate that is no more than 102% of the current annual rental rate. Chicago Municipal Code § 5-14-050(a), (b) (amended Apr. 15,

1-19-0765

2015). If the owner elects to offer a lease, the owner must continue to offer renewals or extensions with rent increases of no more than 2% per year until the owner sells the property to a "*bona fide* third-party purchaser." Chicago Municipal Code § 5-14-050(g) (amended Apr. 15, 2015). A "qualified tenant" is an individual (1) who was using the property as his or her primary residence on the day ownership changed hands, (2) whose household does not include "the mortgagor, or any child, spouse, or parent of the mortgagor," (3) who entered into the rental agreement through "an arms-length transaction," and (4) whose rent is neither "substantially less than fair market rent" nor reduced by a government subsidy. Chicago Municipal Code § 5-14-020 (amended Apr. 15, 2015). To enable the owner to determine whether the tenant is "qualified tenant," the ownership change notice is to be accompanied by a "Tenant Information Disclosure Form," in the format prescribed by Chicago's commissioner of business affairs and consumer protection, and within 21 days of receipt, the tenant is to complete and return the form. Chicago Municipal Code § 5-14-040(b) (amended Apr. 15, 2015). The form includes a blank space for the owner to state the date the document is sent to the tenant and blank spaces in "Section 1" to be filled in with the owner or agent's name, return address, and telephone number so that the tenant may "complete Section 2 and return this Form to the name and address indicated in Section 1." *Tenant Information Disclosure Form*, Chi., https://www.chicago.gov/content/dam/city/depts/bacp/Consumer%20Information/keepchicagorentingdisclosureenglish.pdf (last visited June 17, 2020) [https://perma.cc/V47X-KPJM]. Regardless of whether the tenant returns the form, the next step in the process is for the owner or agent to communicate whether the tenancy may be continued. The ordinance provides:

"No later than 21 days after the date upon which the tenant returns or should have

- 4 -

returned the Tenant Information Disclosure Form pursuant to Section 5-14-040, the owner shall send a written: (1) notice to a Qualified tenant advising the qualified tenant that the owner is paying the required relocation fee: or (ii) offer to extend or renew the qualified tenant's rental agreement, or provide a rental agreement for a replacement rental unit, whichever is applicable, with an annual rental rate in an amount that complies with subsection (a). All notices or offers shall clearly show the date the offer or notice was sent." Chicago Municipal Code § 5-14-050(a)(3) (amended Apr. 15, 2015).

The tenant then has 21 days after receipt to accept (or in circumstances not relevant here, 42 days to accept). Chicago Municipal Code § 5-14-050(a)(3) (amended Apr. 15, 2015). Thus, the ordinance provides a series of 21-day periods in which the parties are to communicate with each other about their new relationship and whether the tenancy will persist despite the change of owners.

¶ 7   The Chicago City Council provided significant penalties for violations of the ordinance, including damages, fines, and injunctive relief. Chicago Municipal Code § 5-14-050 (amended Apr. 15, 2015) (tenant damage claims); § 5-14-90 (amended Apr. 15, 2015) (enforcement through injunction or other suit); § 5-14-100 (added June 5, 2013) (daily fines). The owner's failure to pay for relocation or offer the tenant the option to renew or extend the tenancy permits the qualified tenant to "bring a private right of action in a court of competent jurisdiction," where, "[i]n addition to any other fine or penalty provided," the prevailing plaintiff "shall be awarded damages in an amount equal to two times the relocation assistance fee" (Chicago Municipal Code § 5-14-050(f) (amended Apr. 15, 2015)) and "shall be entitled to recover *** reasonable attorney's fees" (Chicago Municipal Code § 5-14-070 (added June 5, 2013)). An

award of double damages does not "preclude the qualified tenant from recovering other damages to which he may be entitled under [the ordinance]." Chicago Municipal Code § 5-14-050(f) (amended Apr.ug. 15, 2015). "The rights, obligations and remedies set forth in [the ordinance] shall be cumulative and in addition to any others available at law or in equity." Chicago Municipal Code § 5-14-070 (added June 5, 2013). Furthermore,

> "[t]he commissioner [of buildings] or the commissioner of business affairs and consumer protection shall enforce any provision of this chapter by instituting an action with the department of administrative hearings or by the corporation counsel through an injunction or any other suit, action or proceeding at law or in equity in a court of competent jurisdiction." Chicago Municipal Code § 5-14-90 (amended Apr. 15, 2015).

"[A]ny person found guilty of violating this chapter, or any rule or regulation promulgated hereunder, shall be fined not less than $500.00 nor more than $1,000.00 [per day]." Chicago Municipal Code § 5-14-100 (added June 5, 2013).

¶ 8    In this case, the new owner admits to disregarding the ordinance's deadlines. After U.S. Bank purchased the rented unit on October 23, 2015, the tenant was contacted by a law firm and a series of property managers purporting to be the bank's agent. Norman first learned of the foreclosure on November 18, 2015, 26 days after U.S. Bank became the owner, when she saw a document posted on her door from law firm Shapiro Kreisman & Associates, LLC (Shapiro Kreisman). Although Norman's suit does not concern the inadequacies of the initial notice, she states that she did not receive the additional copy that she was supposed to receive through the mail. See Chicago Municipal Code § 5-14-040(a), (c) (amended Apr. 15, 2015). Addressed to "Unk own Occupants," [*(sic)*] the posted document was entitled "Notice to Tenants" and stated

that a property management company, Chicagoland Leasing and Management, Inc. (Chicagoland Leasing), was now responsible for the apartment. It provided contact information for the president of Chicagoland Leasing, Nora Bohanon. It was accompanied by a "Tenant Information Disclosure Form," but Shapiro Kreisman had not dated the form or filled in Section 1 with the name and contact information of the owner or agent, and thus did not request that Norman complete and return the form to anyone. The blank form concluded with the statement, "PLEASE NOTE THAT FAILURE OF THE TENANT TO RETURN THIS FORM DOES NOT RELIEVE THE OWNER FROM ANY OBLIGATION TO EITHER (I) EXTEND THE TENANT'S RENTAL AGREEMENT, OR PROVIDE A REPLACEMENT RENTAL UNIT, WHICHEVER IS APPLICABLE, OR (II) PAY THE RELOCATION ASSISTANCE FEE."

¶ 9    After retrieving the document from her apartment door, Norman attempted to communicate with Bohanon by calling the telephone number provided and leaving messages. No one answered or returned any of Norman's messages. In a subsequent affidavit, Bohanon stated that her property management company had no relationship with U.S Bank or its law firm Shapiro Kreisman with respect to Norman's residence, Bohanon had not authorized anyone to prepare or serve the notice, and if her company received a phone call regarding real estate which the company did not manage, the call would not be returned.

¶ 10    On December 29, 2015, 67 days after U.S. Bank became the new owner, Norman received a letter from a second property manager, Grace Przybysz of Chicago Area Realty, Inc., who did in fact have an agreement with U.S. Bank. Przybysz's letter, addressed simply to "[t]he Occupant," read, "This property has been purchased at [(*sic*)] foreclosure sale. The new owner has assigned me as their representative. I will need you to contact me within 24 hours to discuss

all issues involved in [(*sic*)] transition process." As instructed, Norman called Chicago Area Realty. Norman asked to remain in the apartment, and Przybysz said she would discuss this with the new owner, but that Norman should send a copy of her lease. Norman did as she was asked and then called Chicago Area Realty several times in January 2016, without getting a response.

¶ 11    On Friday, January 22, 2016 at 12:54 p.m., 91 days after U.S. Bank acquired the apartment, Przybysz sent Norman an e-mail, indicating that the new owner wanted her to vacate the apartment quickly and that Norman would have the weekend to decide when she was leaving. The e-mail stated:

> "Hi Geneva,
>
> The new owner offers the following option to assist in relocation:
>
> $2,640 to vacate by 2/6/2016
>
> $2,420 to vacate by 2/21/2016
>
> $2,200 to vacate by 3/7/2016
>
> Please respond no later than Monday 1/25/2016 at noon.
>
> Attached please find the [cash-for-keys] agreement for review.
>
> Thank you and have a nice day!"

¶ 12    Norman did not accept any of Chicago Area Realty's offers.

¶ 13    In February of 2016, Norman received a letter from a third property management company, Carrington Property Services (Carrington), addressed to "Current Resident," which stated that XOME was the new property owner and that Norman should send her rent payments to Carrington. Norman sent her rent payment as instructed. A note in Carrington's electronic files dated February 2, 2016 at 7:36 a.m. indicates that the foreclosure case against the prior property

owner/mortgagor had reached the eviction stage and that Aldridge Connors LLP was "Waiting on lockout date from the sheriff." On or about February 18, 2016, Norman received a letter from the Cook County Sheriff entitled "FINAL NOTICE," which stated that a court order authorized the sheriff to perform an eviction as soon as possible. The letter advised, "YOU SHOULD VACATE THE PROPERTY IMMEDIATELY." Norman went in person to the sheriff's office to inform the staff that she was a tenant who had no knowledge of the eviction order. Her visit apparently suspended the sheriff's efforts. On or about March 26, 2016, Norman's uncashed rent check was returned by Carrington without explanation.

¶ 14    On April 27, 2016, 187 days after U.S. Bank became the owner, Norman received a letter from Carrington and a fourth agency, Infinity Realty Services, offering a lease extension that was conditioned on Norman allowing inspection of her apartment and providing proof of her lease and payment receipts. The letter also said, "At the end of your current lease term, if [U.S. Bank] is still the owner of the property *** your lease will be extended or renewed." The same day that Norman received the letter, U.S. Bank conveyed the property to Cloudview Real Estate, LLC, and the buyer wired funds to U.S. Bank. About a week later, Norman, unaware that the property had been sold, signed the lease extension letter on May 3, 2016, and returned it.

¶ 15    The following year, on September 25, 2017, Norman filed this suit against U.S. Bank and the four property management companies, alleging a failure to timely communicate whether the owner was offering $10,600 in relocation assistance or the continuation of her tenancy. See Chicago Municipal Code § 5-14-050 (amended Apr. 15, 2015). U.S. Bank countered in a motion to dismiss that Norman's acceptance of the lease offer demonstrated that the new property owner had been in "full" or "substantial" compliance with the ordinance. After the trial court denied

U.S. Bank's motion, the parties conducted discovery, and Norman moved for summary judgment. In this appeal, U.S. Bank seeks reversal of orders denying the bank's motion to dismiss the pleading and granting Norman summary judgment, $21,200 in statutory damages, $45,505 in attorney fees, and $300 in court costs. The claims against U.S. Bank's four agents were dismissed and are not at issue.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, U.S. Bank acknowledges that it was 124-days late in complying with its statutory obligation to offer Norman either $10,600 in relocation assistance or a lease renewal/extension. We reiterate that the ordinance permitted U.S. Bank to take no more than 21 days to notify Norman of the change of ownership, to wait no more than 21 days for Norman to return the Tenant Information Disclosure Form, and, regardless of whether Norman returned the form, to take an additional period of no more than 21 days to offer Norman relocation assistance or to continue her tenancy. This means that the bank's offer of relocation or continued tenancy should have been made to Norman on or before the 63rd day of taking ownership, yet it is undisputed that U.S. Bank made that offer on the 187th day.

¶ 18    U.S. Bank argues that the trial court erred in denying the bank's section 2-619(a)(9) motion to dismiss Norman's claim of a statutory violation. 735 ILCS 5/2-619(a)(9) (West 2016) (providing for dismissal where the claim is barred by a defense that negates the cause of action or refutes crucial conclusions of law or conclusions of material fact). The bank's argument is based on its paraphrasing of the ordinance's stated purpose. City Council stated:

> "This chapter shall be known and may be cited as the 'Protecting Tenants in Foreclosed Rental Property Ordinance' and shall be liberally construed and applied to

promote its purposes and policies.

In order to protect and promote the health, safety and welfare of its residents and mitigate the damaging effects on our communities of foreclosures, which individually are catastrophic for the families and tenants who lose their homes, and collectively can economically destabilize an otherwise healthy neighborhood, by causing building abandonment, excessive vacancy, declines in property values, and a perception of a neighborhood as being unworthy of investment, it is the purpose of this chapter and the policy of the city to preserve, protect, maintain and improve rental property and prevent occupied buildings from becoming vacant after foreclosures." Chicago Municipal Code § 5-14-010 (added June 5, 2013).

¶ 19 The bank refers to the ordinance by its common name, the "Keep Chicago Renting Ordinance" or "KCRO," and argues that Norman's own allegations negate her statutory claim. According to the bank, Norman indicated that she "received the notice required under the KCRO" and lived rent-free during the many months that it took the bank to make the lease extension offer. Further, Norman's allegations indicate that her "tenancy continued uninterrupted as was the intended purpose of the KCRO" and that she "was not prejudiced" by the bank's delays. (The bank does not address Norman's allegations that none of the notices were timely, that she lived in uncertainty about her tenancy as she received confusing messages from a series of property managers, and that the bank pursued eviction as if the mortgagor resided in the property, despite knowing that the unit was tenant-occupied.) The bank emphasizes Norman's allegation that she resorted to hiring a lawyer and then contends that she impliedly waived her claim by executing the bank's untimely lease offer under a notation that read "AGREED AND

ACCEPTED TO" while she had "the advice of legal counsel." In other words, Norman's allegations established that her "acceptance of the untimely lease extension offer had the legal effect of waiving the strict compliance with the [KCRO] on which her complaint is premised," and, thus the bank was entitled to dismissal of the action.

¶ 20    The bank further argues that even if dismissal was not warranted, Norman was not entitled to summary judgment because substantial compliance with the ordinance would suffice and the bank substantially complied with its obligations. The bank contends it would be "absurd" to give Norman the full benefit of the ordinance (which the bank characterizes as uninterrupted tenancy) and then allow Norman to "reverse course" by "recover[ing the] windfall damages" and attorney fees mandated by the ordinance. The bank describes the trial court's ruling as a " 'gotcha' manner of applying the [ordinance that] defies the reason for its enactment."

¶ 21    Norman responds that a motion to dismiss cannot be reviewed on appeal following the entry of summary judgment, but since the bank renewed the argument in opposition to Norman's motion for summary judgment, this court may consider the theory in that context. Norman also contends she did not waive her claim by accepting the new lease.

¶ 22    We agree with Norman that the order denying the bank's motion to dismiss is not reviewable.

> "When, as in this case, a defendant attempts to appeal from an order denying a section 2-619 motion in the context of an appeal from a final order disposing of the litigation, this court will not review the order denying the section 2-619 motion, not because we lack jurisdiction to hear the appeal, but because the order merges into the final judgment from which the appeal was taken." *Ovnik v. Podolskey*, 2017 IL App (1st) 162987, ¶ 21, 86

N.E.3d 1093.

Nevertheless, we may review the final judgment order, and thus consider the arguments that were presented in opposition to that ruling. Summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Ovnik*, 2017 IL App (1st) 162987, ¶ 23. 86 N.E.3d 1093; 735 ILCS 5/2-1005(c) (West 2014). We review *de novo* an order granting summary judgment. *Ovnik*, 2017 IL App (1st) 162987, ¶ 23, 86 N.E.3d 1093.

¶ 23    We are not persuaded by the bank's argument that Norman waived her right to the damages and fees that are provided in the ordinance. Waiver is the "intentional relinquishment of a known right" and may occur either through an express statement or be implied through the conduct of the waiving party. *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 104-05, 585 N.E.2d 46, 49 (1991). "[W]here an important statutory right is at issue, an explicit manifestation of intent is required before the right in question can be deemed waived." *Gallagher v. Lenart*, 226 Ill. 2d 208, 239-40, 874 N.E.2d 43, 62 (2007) (collecting cases). None of the allegations or conduct that the bank cites is indicative of an express waiver. Furthermore, the affidavit that Norman attached to her motion for summary judgment describes her communications with the bank, it was not refuted by a counter-affidavit, and it does not suggest that Norman was at that point in time contemplating legal action or was willing to forego her right to legal action. The unopposed affidavit indicates Norman communicated nothing more to the bank than her desire to continue her tenancy:

> "12. On April 27, 2016, US Bank, through its representative Carrington ***, sent me a letter that offered me the option to stay and rent. However, the only way they would

agree to let me stay was if I also agreed to send them a copy of my lease, my driver's license and my daughter's driver's license, (she also lived there with me) along with proof of my residency and rent receipts and only if I completed the '[O]ccupant Summary Form,' See AFFIDAVIT EXHIBIT H 'MAY 2, 2016 EMAIL FROM INFINITY AND CARRINGTON WITH OCCUPANT SUMMARY AND ID REQUIREMENTS.'

13. I signed this paper so I could stay."

¶ 24 A party asserting implied waiver must show a "clear, unequivocal, and decisive act of the party who is alleged to have committed waiver." *Ryder*, 146 Ill. 2d at 105. Here, Norman's signature at the bottom of the letter she received from U.S. Bank's property manager, under the phrase "AGREED AND ACCEPTED TO," manifests only Norman's commitment to rent the apartment from its new owner under the terms that were expressly stated in the letter, and it does not imply that she was foregoing any remedies or her right to statutory compensation from the new owner.

¶ 25 Furthermore, the bank fails to cite any authority indicating that a person's waiver of statutory rights could be signaled as subtly as the bank now argues. The bank cites *Peet v. Village of Northfield*, 48 Ill. App. 2d 320, 199 N.E.2d 287 (1964), in which the court indicated that the plaintiff waived his claim against a municipality for its noncompliance with a statute's procedures by causing the noncompliance when he asked the municipality to expedite its actions, rather than follow its usual protocol. The bank also relies on *City of Peoria v. Peoria Transit Lines, Inc.*, 11 Ill. 2d 520, 144 N.E.2d 609 (1957), in which the plaintiff waived a municipality's strict compliance with an ordinance, when the record showed the compliance was not material and that the plaintiff had acquiesced to the municipality's noncompliance for eight years. Neither

of these two cases is on point because Norman had no hand in the bank's disregard of the ordinance and there is no indication that she condoned the bank's misconduct before she filed suit. Neither case supports the bank's contention that an implied waiver occurred.

¶ 26    The bank is arguing that Norman's retention of an attorney is significant, but the bank creates this argument from whole cloth and cites no authority substantiating that having a legal representative increases the likelihood that a contracting party is waiving his or her statutory rights. To the contrary, it would seem that hiring legal counsel demonstrates a desire to assert, rather than to give up, legal rights. Furthermore, removing the protection of the municipal ordinance whenever a tenant retains a lawyer would discourage consumer awareness and gut an ordinance whose stated purposes include promoting the "health, safety and welfare" of Chicago's residents. Chicago Municipal Code § 5-14-010 (added June 5, 2013). The suggestion that Norman was willing to acquiesce to the bank's conduct and forgo her rights is also belied by the fact that she resisted Chicago Area Realty's proposal that she vacate the premises within two weeks in return for $2640, which would have been approximately one-quarter of the $10,600 relocation assistance that Norman was entitled to under the ordinance. Norman also continued to advocate for her rights as a tenant rather than capitulate to the bank's wishes when she received the sheriff's warning of her imminent eviction from the subject property. The record does not support the bank's contention that counsel's involvement signaled Norman's willingness to waive her legal rights.

¶ 27    We reject U.S. Bank's contention that Norman's continued tenancy without monetary damages was sufficient under the ordinance and that Norman's signature on the lease extension while she had legal representation was an implied waiver of her damage claim.

¶ 28    In order to address the bank's contention that substantial compliance, rather than strict compliance, is sufficient, we must delve into the language of the ordinance. The bank acknowledges that the usual rules of statutory interpretation are applied to municipal ordinances. *Pooh-Bah Enterprises, Inc., v. County of Cook*, 232 Ill. 2d 463, 492, 905 N.E. 781, 799 (2009). We are to determine and give effect to the legislating body's intent. *Scott v. City of Chicago*, 2015 IL App (1st) 140570, ¶ 11, 29 N.E.3d 592. We are to determine City Council's intent by reading the language of the ordinance, and when it is clear and unambiguous, we are to apply it as written without resorting to other rules of construction. *Scott*, 2015 IL App (1st) 140570, ¶ 11. We are to give every word, clause, and sentence reasonable meaning and, to the extent possible, not render any language superfluous. *Scott*, 2015 IL App (1st) 140570, ¶ 11. "It is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used. [Citations.]' " *Corbett v. County of Lake*, 2017 IL 121536, ¶ 27, 104 N.E.3d 389 (quoting *Deal v. United States*, 508 U.S. 129, 132, 113 S. Ct. 1993, 124 L.Ed.2d 44 (1993)). " 'The terms [of the ordinance] are not to be considered in a vacuum' "; instead, "the words and phrases *** must be construed in light of the [ordinance] as a whole, with each provision construed in connection with every other section." (Internal quotation marks omitted.) *Corbett*, 2017 IL 121536, ¶ 27, 104 N.E.3d 389. We may not add exceptions, conditions, or limitations to legislation. *Scott*, 2015 IL App (1st) 140570, ¶ 11, 29 N.E.3d 592.

¶ 29    The ordinance makes repeated use of the verb "shall." That verb is used in the paragraphs about giving the tenant notice and offering relocation assistance or a continued tenancy (Chicago Municipal Code §§ 5-14-040(a), 5-14-050 (amended Apr. 15, 2015)). It is also used in the

paragraphs about damages and attorney fees for a prevailing plaintiff (Chicago Municipal Code § 5-14-050(f) (amended Apr. 15, 2015); § 5-14-070 (addedmmended JuneAug. 5, 2013)).

¶ 30    When interpreting a statute or ordinance, the "use of the word 'shall' generally indicates that the legislature intended to impose a mandatory obligation." *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 16, 999 N.E.2d 331 (former wife's noncompliance with statute governing notice of withholding, which provided that notice "shall include *** social security number" of former husband, as child support obligor, rendered her notice invalid, and thus, excused former husband's employer from duty to withhold court-ordered child support from former husband's pay). Another indication that an obligation is "mandatory, as opposed to merely directory," is that the legislating body "dictate[s] a particular consequence for failure to comply with the provision." *Schultz*, 2013 IL 115738, ¶ 16. Furthermore, the combination of a mandatory obligation and a penalty or consequences for noncompliance indicates that strict compliance, rather than substantial compliance is necessary. *Schultz v. Performance Lighting, Inc.*, 2013 IL App (2d) 120405, ¶ 14 (citing *Sutton v. Cook County Officers Electoral Board*, 2012 IL App (1st) 122528, ¶ 16, 979 N.E.2d 515, and *Samuelson v. Cook County Officers Electoral Board*, 2012 IL App (1st) 120581, ¶ 31, 969 N.E.2d 468), *aff'd*, 2013 IL 115738, 999 N.E.2d 331.

¶ 31    The bank contends, however, that substantial compliance with even a mandatory obligation may be sufficient, as long as (1) the purpose of the statute can be realized without strict compliance and (2) there is no prejudice from the failure to strictly comply with the terms. The bank contends that Norman's reading of the ordinance is "extreme" and would create an environment "rife with potential for abuse and absurd results." The bank contends this case

demonstrates that abuse and absurdity, given that Norman was awarded a "windfall" of statutory penalties and attorney fees in order to remedy the bank's "compliant (but tardy) lease extension offer *which she accepted*." (Emphasis in original.)

¶ 32    Norman responds that the plain language of the ordinance and its history indicate that City Council expected strict compliance with the obligations and deadlines that the ordinance imposes on a new owner of a foreclosed, occupied apartment.

¶ 33    Once again, we find the bank's argument unpersuasive. The argument is premised on a case interpreting a statute that created a mandatory obligation by using the word "shall," but that statute did not include a penalty for noncompliance. See *Behl v. Gingerich*, 396 Ill. App. 3d 1078, 1086, 920 N.E.2d 665, 671 (2009). Accordingly, the court went through the two-part analysis that U.S. Bank now proposes would result in our reversal of the trial court's summary judgment ruling. The case is not relevant here because the Chicago ordinance at issue not only imposed mandatory obligations on U.S. Bank by using the word "shall" but also mandated the imposition of significant financial consequences for U.S. Bank's failure to comply. Thus, City Council's language is a clear message to the buyers of foreclosed properties, the tenants which those new owners inherit, and the courts that address claims under the ordinance, that strict compliance is necessary. Moreover, after the ordinance was in effect for about two years, City Council amended the language with the 21-day increments in which a new owner is to communicate with an existing tenant and then offer either relocation assistance or a continued tenancy to any "qualified tenant." The new timeframe enhanced the property owner's previous obligations and further signaled that substantial compliance would not be enough. Norman was entitled to judgment on her claim regarding U.S. Bank's failure to strictly comply with its

obligation.

¶ 34    We affirm the trial court's summary judgment order and the subsequent award of the amount of damages specified in the ordinance.

¶ 35    Our last consideration is U.S. Bank's contention that the attorney fee award was excessive. U.S. Bank does not challenge the attorneys' hourly billing rates, but contends it was not reasonable of Norman's attorneys to expend 104 hours when the activities essentially consisted of defending a motion to dismiss and bringing a motion for summary judgment. U.S. Bank's second argument is that the trial court "summarily awarded the full amount requested" even though $20,000 of the timesheet entries concerned multiple defendants (*e.g.*, "Norman moved for summary judgment as to *both* [U.S. Bank's property manager] Chicago Area Realty and U.S.Bank"). U.S. Bank contends that only entries that were "dedicated" to U.S. Bank should have been included in the fee award and that "ambiguity [in the entries] should have either prompted a reduction in the fee award or an evidentiary hearing."

¶ 36    The trial court has broad discretion to award attorney fees and its decision will not be disturbed on appeal absent an abuse of that discretion. *Guerrant v.Roth*, 334 Ill. App. 3d 259, 262-63, 777 N.E.24 499, 502 (2002) (distinguishing between a trial court's discretionary determination of whether fees are reasonable and a trial court's legal determination of whether a contract authorizes compensation for certain expenses). The trial court is in a better position than a reviewing court to evaluate the attorney fees and costs claimed. *Stein v. Feldmann*, 85 Ill. App. 3d 973, 974, 407 N.E.2d 768, 769 (1980). "[A] party challenging a trial court's decision regarding attorney fees is actually challenging the trial court's discretion in determining what is reasonable." *Guerrant*, 334 Ill. App. 3d at 262-63, 777 N.E.2d 502. "Even where the trial court

- 19 -

has, in its calculations, included improper fees or excluded recoverable fees, this court will not disturb the judgment unless 'the total fees and costs awarded *** was [so excessive or] so inadequate as to amount to a clear abuse of discretion ***.' " *Sampson v. Miglin*, 279 Ill. App. 3d 270, 281, 664 N.E.2d 281, 288 (1996) (quoting *Warren v. LeMay*, 142 Ill. App. 3d 550, 582, 491 N.E.2d 464, 485 (1986)). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41, 39 N.E.3d 961. To properly determine the reasonable value of an attorney's services, courts are to consider

> "the skill and standing of the attorney employed, the nature of the case and the difficulty of the questions at issue, the amount and importance of the subject matter, the degree of responsibility involved in the management of the case, the time and labor required, the usual and customary fee in the community, and the benefit resulting to the client." *Mireles v. Indiana Harbor Belt R.R. Corp.*, 154 Ill. App. 3d 547, 551, 507 N.E.2d 129, 132 (1987).

¶ 37    Here, U.S. Bank has not established that the trial court's award was an abuse of discretion. Norman's fee request was supported by affidavits from counsel and a billing statement which detailed the services performed, including the date the work was performed, the work that was performed, and the name of the attorney who performed the itemized task. The fee petition refutes U.S. Bank's contention that Norman's attorneys did little more than oppose the bank's motion to dismiss and move for summary judgment. The fee petition details other tasks such as drafting the complaint, issuing discovery, drafting a response to U.S. Bank's affirmative defenses, briefing the issue of attorney fees, and attending court dates, including the hearing on

the reasonableness of the fee petition. The fee petition and oral arguments indicated that counsel exercised billing judgment by "zeroing out" items pertaining to the other defendants and reducing some of the itemized hours to account for the inefficiency of the less experienced attorneys who worked on the case. These adjustments reduced the fee petition by almost $9000. This was an uncomplicated case, but it concerned a new ordinance for which there was little precedent, and the case proceeded to an efficient resolution by way of Norman's motion for summary judgment.

¶ 38    The record also indicates that the issue of fees was fully briefed and that a hearing was conducted in which both parties had an opportunity to argue. The arguments encompassed the factors to consider when awarding attorney fees, whether the itemized entries sufficiently distinguished amongst the various defendants and had been reduced accordingly, and whether it was reasonable to have both senior and less experienced attorneys working on Norman's behalf. At no point did U.S. Bank request an evidentiary hearing, but it is now contending that the trial court should have ordered one *sua sponte*, despite being unconvinced by any of the bank's arguments about the fees. If U.S. Bank wished to introduce or address evidence, counsel should have made the request in the trial court. *Stein*, 85 Ill. App. 3d at 974 (a party who fails to request a hearing cannot complain on appeal). After considering the evidence and arguments as to whether the fee petition was reasonable, the trial court awarded the full amount. U.S. Bank has not shown that the trial court's decision was an abuse of discretion.

¶ 39    We affirm the trial court's fee award.

¶ 40                                  III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the trial court's summary judgment order, the award

of damages, and the award of attorney fees.

¶ 42     Affirmed.

## No. 1-19-0765

| | |
|---|---|
| **Cite as:** | *Norman v. U.S. Bank National Ass'n*, 2020 IL App (1st) 190765 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2017-M1-126460; the Hon. Dennis M. McGuire, Judge, presiding. |
| **Attorneys for Appellant:** | Harry N. Arger, Rosa M. Tumialán, and Margaret Rhiew, of Dykema Gossett PLLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Lawyers' Committee for Better Housing, of Chicago (Julie Pautsch, Frank G. Avellone, and Aileen Flanagan, of counsel, and Caelin Miltko and Will Cronin, law students), for appellee. |